STATE OF NEW JERSEY, PLAINTIFF-APPELLANT-CROSS-
RESPONDENT, v. SARAH JEAN LAMB, DEFENDANT-
RESPONDENT-CROSS-APPELLANT.

Argued October 26, 1976—Decided December 8, 1976.

*Mr. Lowell Espey,* Deputy Attorney General, argued the cause for plaintiff (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Espey* of counsel and on the brief).

*Mr. William L. Roughton, Jr.,* Assistant Deputy Public Defender, argued the cause for defendant (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Roughton* of counsel; *Mr. Roughton* and *Mr. Michael Suffness,* Assistant Deputy Public Defender, on the brief).

The opinion of the court was delivered by

SULLIVAN, J. Defendant, Sarah Jean Lamb, was convicted of second degree murder for the fatal stabbing of her estranged husband and was sentenced to a term of 12 to 15 years to be served in the New Jersey Correctional Institute for Women. On appeal, the Appellate Division reversed the judgment of conviction finding trial errors which it held, in the aggregate, prejudiced defendant's right to a fair trial. It ordered that defendant be tried. 134 *N. J. Super.* 575 (1975). We granted the State's petition for certification, 68 *N. J.* 494 (1975), and thereafter granted defendant's crosspetition which raised additional claims of trial error. 70 *N. J.* 138 (1975). We affirm the grant of a new trial.

The stabbing took place on March 23, 1973 when defendant was 18 years of age. She and her husband Larry Lamb had been married in June 1970. The marriage was not a harmonious one, being marked by the husband's erratic work habits, frequent drinking and leaving home on weekends, and recurring instances in which he physically abused defendant. Finally, some three weeks before the stabbing, the couple, who had been living in a small third floor apartment, decided to separate. However, an argument ensued over who was to stay in the apartment. Defendant testified that her husband beat her and put a knife to her throat when she refused to leave. However, when defendant said she was going to the police, he left the apartment.

A few days later an unsuccessful attempt at reconciliation was made by the husband during which he again threatened to kill defendant. Subsequently, he asked defendant to let him have the apartment until he found another place to stay. Defendant agreed, and moved in with her family, the husband occupying the apartment for several days. He then removed all his belongings and went to live with his girlfriend. After her husband vacated the premises, defendant moved back in together with her cousin Charlene Powell.

On the night of the killing, defendant and Charlene were at a local bar when defendant's husband came in and asked defendant to go out with him. Defendant refused, saying she was going home. She, Charlene and a male companion, Ricky McCullough, left the bar and, after stopping for a hamburger, went to defendant's apartment. Charlene then returned to the bar. Defendant and Ricky remained in the apartment listening to records.

At this point defendant's husband telephoned. He had been drinking, was in an ugly mood and accused defendant of having "somebody" in the apartment with her. Defendant said she was alone. What happened thereafter was testified to by defendant at trial as follows:

Q. Then what happened?
A. A few minutes later I hear somebody coming up the steps because I was standing in the bedroom by the night stand because I went in the bedroom to answer the phone. So I heard somebody coming up the steps. So I heard the door. I didn't go open the door. I heard somebody. I hear the fist knock the door, because if you hit it with your fist it would open. You hit it very hard.
Q. With a motion like this the door would open?
A. It would come open. So Ricky was standing like in the living room and the bedroom.

      *          *         *         *         *         *         *         *

Q. And the next thing you heard was the pound on the door and the door opened?
A. Right.
Q. And who came in?
A. Larry come running in like that. Ricky was standing between the living room and the bedroom. And so Ricky walked up and saw — so Larry took and punched Ricky and so the next thing I know they were on the bed and tussling. I was trying to break it up.
Q. Which bed?
A. On the bed right here.
Q. In the bed?
A. I was trying to break it up. When I went over and tried to grab Larry off Ricky, Larry took and gave me a backhand like with his fist balled up and I went against the wall.
Q. And where did he hit you?
A. In my face. And I bounced up against the wall. And I come back and I was still trying to break them up. I don't know.

Some way Ricky got away. He was going in the living room to get his coat. And so he could leave. And so by that time he walked out. I seen Rickey when he went in the living room. Larry took and grabbed me and throwed me on the bed and put his hand around my neck. He said, bitch, I'm going to kill you before I leave here. Before I leave here tonight. So by that time Ricky was coming back into the room. Him and Ricky started back. They started to tussling and got in the bed. And I ran in the kitchen and I got the knife out of the drawer.

Q. Why did you get the knife?

A. I was afraid. After he said he was going to kill me and everything and I wasn't really thinking, you know, about — I don't think I was thinking about what I could do to defend myself. And so than I ran back into the bedroom. So he left Ricky alone and he was coming after me. I remember getting up on the bed.

Q. What do you mean by getting up on the bed?

A. I jumped up on the bed. I closed my eyes and I swung the knife.

Q. When you swung the knife what was your husband doing?

A. He was coming at me with his fist. When he went to come at me with his fist I remember closing my eyes and coming down with the knife.

Q. And then what happened?

A. When I opened my eyes Larry was standing there and he looked at me. He said, Jean, you stabbed me. Like that. So I said, Oh my God, no I didn't. Then I seen the blood start flowing. And he fell to the floor. When he fell to the floor then I said, Oh God please don't let him be dead, like that.

The trial judge, over objection, held that the husband was not an intruder in the apartment and had as much right to be there as defendant. He therefore held inapplicable the principle that a person does not have to retreat in his own home and instead charged the jury that a defendant may not resort to the use of deadly force when an opportunity for safe retreat is at hand. The Appellate Division, although it reversed the judgment of conviction for trial errors, held that the charge relating to retreat was correct. We find it to be erroneous.

██ ██ In the circumstances of this case defendant's estranged husband did not have as much right to be in the apartment as defendant. It was her home. He was in fact an intruder and defendant was under no duty to retreat. See *State v. Christener*, 71 *N. J.* 55 (1976), Hughes, C. J., (con-

curring). Nor did defendant's status change when she ran into the kitchen where there was a door out into the hallway. She was still in her home. In the exigent situation confronting her she ultimately chose to stand her ground. By this she did not abandon or lose her legal right not to retreat. The erroneous charge on this point, standing alone, required reversal of the judgment of conviction.[1]

Since the case has to be retried, it is appropriate to comment on the charge to the jury dealing with provocation as an element of the crime of manslaughter. The trial judge said this:

First. Mere words alone or looks or gestures no matter how abusive, threatening or insulting are never such provocation. Provocation in law must be such as in the opinion of the jury would probably throw the mind of an average person of ordinary self control into a state of uncontrolled rage or anger. The provocation must be so gross as to cause the ordinary reasonable person to lose her self control and to use violence with fatal results. And the defendant must in fact have been deprived of her self control under the stress of such provocation and must have committed the crime while so deprived. The provocation must be of such character and so close upon the act of killing that for the moment the defendant could not be considered as the master of her own understanding. If such an interval of time elapsed between the provocation and the killing as is reasonably sufficient for reason to resume control the offense may not then be considered reduced to manslaughter. Whether the provocation was sufficient or not and whether the time which lapsed between the provocation given and the act of killing was sufficient or not for the accused to subdue or control her emotions are questions of fact to be determined by the jurors on consideration of all the evidence in the case.

Defense counsel made no objection to this charge. However, the Appellate Division concluded that it should have been more carefully tailored to the facts of the relationship between defendant and the deceased and, citing *State v.*

---

[1]Even though defendant had no duty to retreat, a jury issue exists as to whether or not, in the circumstances, she was justified in resorting to deadly force.

*Guido,* 40 *N. J.* 191, 211 (1963), said that the jury should have been told that sufficient provocation may arise from a course of ill treatment.

■ Since there was evidence of prior repeated physical mistreatment of defendant by decedent, including threats to her life, we agree that the jury should have been instructed that, in determining the question of provocation, it was to consider not only decedent's conduct and threats that night, but also his prior mistreatment of defendant, applying the standard set forth in *State v. Guido, supra,* 40 *N. J.* at 211.

■ The Appellate Division also concluded that the black and white photographs of decedent's body on the bedroom floor were improperly admitted into evidence. The relevancy of this type of proof is invariably left to the sound discretion of the trial court. It has not been demonstrated that this was a "palpable abuse" of discretion. *State v. Thompson,* 59 *N. J.* 396, 420 (1971).

Affirmed.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For reversal*—None.