694 A.2d 564

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ELLEN GARTLAND, DEFENDANT–APPELLANT.

Argued January 21, 1997—Decided June 19, 1997.

458

*Jacqueline E. Turner*, Assistant Deputy Public Defender, argued the cause for appellant (*Susan L. Reisner*, Public Defender, attorney).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney).

*Lawrence S. Lustberg* argued the cause for amicus curiae, New Jersey Coalition for Battered Women (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Lustberg, Lenora M. Lapidus* and *James E. Ryan,* on the brief).

PER CURIAM.

This appeal concerns the statutory duty to retreat before resorting to the use of deadly force in self-defense. In this case a woman killed her husband in a bedroom of their home. The jury convicted her of reckless manslaughter. She died while her appeal was pending. Three issues were argued in the case: (1) whether her appeal should be dismissed because it became moot upon her death; (2) whether the trial court erred in instructing the jury under the circumstances that she had a duty to retreat from her separate bedroom before using deadly force; and (3) whether the trial court should have specifically instructed the jury that it could consider the history of spousal abuse to determine (in addition to whether she might have killed in the heat of passion arising from a reasonable provocation) whether she honestly and reasonably believed that deadly force was necessary to protect herself against death or serious bodily injury. From the evidence in the case, a jury could have found the following facts.

I

The killing occurred on February 8, 1993. The jury heard evidence of long-standing physical and emotional abuse inflicted by the victim on defendant. Witnesses portrayed John Gartland as a violent and threatening husband obsessed with jealousy.

On the afternoon of the killing, the Gartlands stopped at a tavern in Newark. There, they began to argue. When the Gartlands returned home at about 5:00 p.m., a neighbor heard Mr.

Gartland (John) threaten his wife. Other neighbors heard similar abuse and threats.

The argument continued when John could not find the remote control for the television and accused Ellen of hiding it. Angered, he left the home. When he returned, he renewed the argument about the remote control. Ellen asked him to leave her alone and went upstairs to her bedroom. For over ten years, she and her husband had had separate bedrooms.

Previously, John had left her alone in this room. On this evening, he followed her into her bedroom. She told him to go to bed and to leave her alone. He approached her, threatening to strike her. One of them, the parties dispute which, said "I'm going to hurt you" as he approached her.

Ellen took her son's hunting shotgun from her bedroom closet. She pointed it at her husband and told him to stop. He said, "You're not going to do [anything] to me because you, bitch, I'm going to kill you." He lunged at her with his fists clenched. She pulled the trigger. The shotgun blast hit her husband. He stepped into the hallway and fell.

Ellen dropped the gun, called an operator, and asked for an ambulance, saying that she had just shot her husband. She then called her son as well as John Gartland's son. She told the responding officers that she had feared for her life. She said that she would never forget the look on his face and that he approached her looking "like a devil."

At trial, the jury had asked twice during its deliberations for clarification of the court's charge on self-defense. On both occasions the trial court repeated its initial instructions. The instruction never specifically apprised the jury that it could consider the seventeen years of spousal abuse suffered by Mrs. Gartland in determining whether she honestly and reasonably believed that deadly force was necessary to protect herself against her husband. The trial court used the Model Jury Charge and told the jury that "[a] reasonable belief is one which is to be held by a person of

ordinary prudence and intelligence situated as Mrs. Gartland was on February 8, 1993."

Prior to the charge, defense counsel objected to the court's intent to charge that Ellen had a duty to retreat before resorting to deadly force. Counsel renewed his objection immediately after the charge. Before the first recharge on self-defense, defense counsel again objected. He noted that because Ellen had been in her own room, one that her husband never occupied, he was not a cohabitant and under the law she had no duty to retreat from her own separate dwelling. The trial court ruled that "under the statute, there was a duty to retreat." The court gave the Model Jury Charge:

> And even if you find the use of deadly force was reasonable, there are limitations on the use of deadly force.... If you find that Mrs. Gartland knew that she could avoid the necessity of using deadly force by retreating from that house, providing Mrs. Gartland knew that she could do so with complete safety, then the defense is not available to her.

The jury convicted Mrs. Gartland of reckless manslaughter. Two jurors later contacted the court describing confusion and indecision in their deliberations. After denying a motion for a new trial, the court sentenced Mrs. Gartland to a five-year term with a mandatory three-years imprisonment under the Graves Act. She was freed on bail pending appeal.

The Appellate Division affirmed the conviction. It found that the instructions had made it clear that the court was not limiting the jury to the actions and words of the decedent on February 8, 1993, and that the court had given the jury sufficient latitude to consider the decedent's prior mistreatment and physical and psychological abuse of defendant. It also found that the court correctly charged on the statutory duty to retreat before the use of deadly force. Defendant died after her petition for certification was filed. We granted the petition, 146 *N.J.* 499, 683 *A.*2d 202 (1996), and reserved decision on the State's motion to dismiss the appeal.

## II

Should the appeal be dismissed because defendant died before her appeal could be heard by this Court?

In *State v. McDonald,* a dissenting justice reasoned that to continue the appeal of a deceased defendant would extend a "court's jurisdiction over criminal defendants beyond the grave. Its appellate grasp [would reach] 'from here to eternity'!" 144 *Wis.*2d 531, 424 *N.W.*2d 411, 415–16 (1988) (Day, J., dissenting).

Chief Justice Heffernan, concurring in the majority's decision to permit the appeal to continue, wrote:

It may well be, as the dissent suggests, that the defendant in this case is in the hands of God. However, the responsibility for resolving the legal uncertainties left behind is squarely in the hands of this court.

... It is not [the decedent's] appeal which is moot, as the dissent would have it, but rather [the decedent's] death which is moot, because [the decedent] did not take the potential errors of our justice system into the grave.... These potential errors remain behind to perplex and confound [the decedent's] relatives, friends, reputation, and the legal system.

[*McDonald, supra,* 424 *N.W.*2d at 415 (Heffernan, C.J., concurring).]

In State v. McDonald: *Death Of a Criminal Defendant Pending Appeal in Wisconsin—The Appeal Survives,* 1989 *Wis. L.Rev.* 811, Lynne J. Splitek sets forth the prevailing American rule on the subject:

When a criminal defendant dies after a conviction and while an appeal of right is pending, most state and federal courts abate the proceedings *ab initio.* Typically, courts dismiss the appeal, vacate the judgment of conviction, and remand the case to the trial court with instructions to dismiss the indictment against the defendant.

[*Id.* at 812–13.]

In *Dove v. United States,* 423 *U.S.* 325, 96 *S.Ct.* 579, 46 *L. Ed.*2d 531 (1976), the United States Supreme Court dismissed a petition for certiorari when the petitioner died while the application was pending. Lower courts have interpreted *Dove* as distinguishing between a defendant who dies pending an appeal of right (in which proceedings are abated) and one who dies pending a discretionary appeal (in which only the appeal is dismissed). *See United States v. Moehlenkamp,* 557 *F.*2d 126 (7th Cir.1977) (holding that proceedings should abate when defendant dies before conclusion of

appeal of right). Courts in some jurisdictions simply dismiss the appeal of a deceased defendant and refuse to abate the conviction. Splitek, *supra*, at 817 (citing *Whitehouse v. State*, 266 *Ind.* 527, 364 *N.E.*2d, 1015, 1016 (1977)).

New Jersey has followed a middle course. *Newark v. Pulverman*, 12 *N.J.* 105, 95 *A.*2d 889 (1953), held that the executrix of one found guilty in a municipal court proceeding had status to prosecute an appeal before this Court. Recalling that *Bower v. State*, 135 *N.J.L.* 564, 568, 53 *A.*2d 357 (S.Ct.1947), had held that "[t]he stigma of arrest, conviction and jail sentence does not become moot simply because ... the sentence has been served and completed," the *Pulverman* court held that "there is likewise no mootness insofar as the family of a deceased defendant is concerned and that his legal representative should have the opportunity to establish on appeal that the conviction was wrongful." 12 *N.J.* at 116, 95 *A.*2d 889. Our Court Rules provided then as now that "[i]n any criminal action, any defendant, the defendant's legal representative, or other person aggrieved by the final judgment of conviction entered by the Superior Court ... may appeal." *R.* 2:3-2.

 Unlike the federal constitution, the New Jersey Constitution does not confine the exercise of the judicial power to actual cases and controversies. *Compare U.S. Const.* art. 3, sec. 2, cl. 1 *with N.J. Const.* art. 6, sec. 1, par. 1. Nevertheless, this Court will not render advisory opinions or exercise its jurisdiction in the abstract. *See In re J.I.S. Indus. Serv. Co. Landfill*, 110 *N.J.* 101, 104, 539 *A.*2d 1197 (1988). Our courts will entertain a case that has become moot when the issue is of significant public importance and is likely to recur. We decided the right of one to die even though her death had occurred before we could decide her appeal. *In re Farrell*, 108 *N.J.* 335, 529 *A.*2d 404 (1987).

The power to review a criminal appeal of a dead defendant is rarely exercised. In *State v. DeBellis*, 174 *N.J.Super.* 195, 413 *A.*2d 986 (App.Div.1980), the defendant had filed and perfected an appeal from a criminal conviction. Citing *Pulverman, supra,* the

court wrote: "We are advised that [the defendant] subsequently died. But nevertheless we decide the appeal.... Since no application has been made for a substitution of parties we will consider the appeal as though still being prosecuted by DeBellis." 174 *N.J.Super.* at 198, 413 *A.*2d 986.

There is concern that the Public Defender should have explored more fully the availability of assets and resources in defendant's estate before continuing the appeal. Because of the significant public importance of the issues and the likelihood that they will recur, we cannot say that the Public Defender abused her statutory discretion in prosecuting this appeal in her institutional capacity. The problem of domestic violence is widespread. In *State v. Kelly,* 97 *N.J.* 178, 190–91, 478 *A.*2d 364 (1984), Chief Justice Wilentz observed:

What has been revealed is that [family violence] affects many more people than had been thought and that the victims of the violence are not only the battered family members (almost always either the wife or the children). There are also many other strangers to the family who feel the devastating impact, often in the form of violence, of the psychological damage suffered by the victims.

Our Legislature has made a strong commitment to the eradication of domestic violence. *See* Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25–17 to –33. The Legislature has an equally strong commitment to eradicating murder and other offenses committed with guns. To the extent that this decision addresses concerns in this area, it is worth the judicial effort.

The power to entertain a criminal appeal even after death should be sparingly exercised. A conviction should not be set aside unless the record shows palpably that there has been a fundamental miscarriage of justice, an error that "cut mortally into the substantive rights of the defendant ... [or impaired] a defendant's ability to maintain a defense on the merits." *State v. Harper,* 128 *N.J.Super.* 270, 277, 319 *A.*2d 771 (App.Div.) (Handler, J.A.D.) (discussing standard for review of invited error), *certif. denied,* 65 *N.J.* 574, 325 *A.*2d 708 (1974). Such caution is required because there is an intrinsic imbalance in the conduct of a criminal appeal on behalf of a deceased defendant. The contest

is one-sided. The defendant can no longer be retried for the crime. The State and the victims of the crime cannot win. If the conviction is set aside, the State is realistically deprived of the opportunity to vindicate the public interest in enforcement of the law. On the other hand, important interests of the defendant or society at large may be at stake if an erroneous conviction is left standing. We find those important interests present here.

### III

Did the trial court err in failing to instruct the jury that defendant had no duty to retreat if defendant's bedroom functioned as a separate dwelling and that her husband was an intruder into that separate room within the house that they shared?

### A.

As noted, this was the principal objection raised at trial:

Traditionally self-defense claims require that a person who can safely retreat from the confrontation avail themselves of that means of escape. However, this requirement has since been modified, and today most courts recognize exceptions to the general retreat principle. The most notable and expansive exception has been the "castle doctrine." The castle doctrine states that if the confrontation takes place in one's home or "castle" then the requirement is suspended. This exception was established to allow individuals to defend their place of habitation. Application of this exception, however, becomes more challenging when the aggressor intruder is a co-occupant of the structure or when both parties have a legal right to occupy the dwelling. Currently, jurisdictions vary as to their willingness to extend the castle doctrine to self-defense situations where both parties legally occupy the home, but the majority of these jurisdictions extend the privilege of non-retreat to apply in these types of situations.

[Beth Bjerregaard & Anita N. Blowers, *Chartering a New Frontier for Self-Defense Claims: The Applicability of the Battered Person Syndrome as a Defense for Parricide Offenders*, 33 *U. Louisville J. Fam. L.* 843, 870–71 (1995).]

■ New Jersey is among the minority of jurisdictions that impose a duty of retreat on a woman attacked by her cohabitant spouse. The New Jersey Code of Criminal Justice contains carefully articulated standards for determining when the use of force against another is justified. The drafters of our Code originally approached the concept of justification in terms of the subjective attitudes of the criminal actor. However, in the course

of legislative modifications the self-defense provisions of the Code were altered to reestablish objective standards of self-defense:

> **Use of force justifiable for protection of the person.** Subject to the provisions of this section and of section 2C:3–9, the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting [the actor] against the use of unlawful force by such other person on the present occasion.
>
> [*N.J.S.A.* 2C:3–4a.]

Those general provisions are qualified in the case of the use of deadly force as that is defined in *N.J.S.A.* 2C:3–11. Concerning deadly force, the Code provides: "The use of deadly force is not justifiable under this section unless the actor reasonably believes that such force is necessary to protect [the actor] against death or serious bodily harm ...." *N.J.S.A.* 2C:3–4b(2). Even if deadly force is permissible, the actor still has the duty to retreat from the scene if the actor can do so safely. *N.J.S.A.* 2C:3–4b(2)(b). One exception to this duty to retreat is if the actor is in his or her own home at the time of the attack (the so-called "castle doctrine"), unless the attacker is a cohabitant. *N.J.S.A.* 2C:3–4b(2)(b)(i) states that "[t]he actor is not obliged to retreat from [the] dwelling, unless [the actor] was the initial aggressor or is assailed in [the actor's own] dwelling by another person whose dwelling the actor knows it to be...." *N.J.S.A.* 2C:3–4c provides special rules for the use of deadly force on an intruder into one's dwelling. For example, under this provision, deadly force may be used against an intruder to counter any level of unlawful force threatened by the intruder.

The Public Defender argues that it is ironic that Ellen Gartland could have used the shotgun against a burglar who intended to do her no serious harm but was precluded from using the same force against the true threat in her life, her husband. Instead, the law requires her to flee from her bedroom, which she had described as the only sanctuary in her chaos-filled home.

### B.

The retreat doctrine is one of several related legal doctrines affecting battered women as criminal defendants. *See generally*

Holly Maguigan, *Battered Women and Self–Defense: Myths and Misconceptions in Current Reform Proposals,* 140 *U. Pa. L.Rev.* 379 (1991). The male pronouns used in the Code reflect a history of self-defense that is derived from a male model.[1]

Under the common law regime, even if faced with immediate danger of death or great bodily harm, an individual could use only equal force to repel the danger. The doctrine of equal force, developed on a prototype of two males of equal size and strength, held that, if attacked without a deadly weapon, one could not respond with a deadly weapon. This doctrine obviously disadvantaged women, who are generally smaller and lack the same upper-body strength as men.

Traditional common law self-defense imposes no duty to retreat, except for co-occupants of the same house. Given that most men are assaulted and killed outside their homes by strangers, while most women are assaulted and killed within their homes by male intimates, this doctrine also disadvantaged women.

[Marina Angel, *Criminal Law And Women: Giving The Abused Woman Who Kills A Jury Of Her Peers Who Appreciate Trifles,* 33 *Am.Crim. L.Rev.* 229, 320 (1996).]

### Advocates of women's rights seek change.

Imposition of the duty to retreat on a battered women who finds herself the target of a unilateral, unprovoked attack in her own home is inherently unfair. During repeated instances of past abuse, she has "retreated," only to be caught, dragged back inside, and severely beaten again. If she manages to escape, other hurdles confront her. Where will she go if she has no money, no transportation, and if her children are left behind in the "care" of an enraged man?

One commentator points out the injustice and absurdity of expecting a battered woman to retreat and "just walk away."

Indeed, battered women seem to be expected to escape from situations in which escape, for anyone else, would clearly be seen to be impossible. In case after case, in which the obligation to retreat was an issue at the trial or on appeal, women have been convicted for killing men who were holding them with one hand and beating them with the other or who had them pinned down on the floor or trapped in a corner or were menacing them with a knife or with a loaded gun ... [The] loophole in the castle doctrine profoundly impacts battered women. If the attacker

---

[1] For example, the "true man" doctrine basically provides that "an individual need not retreat, even if he can do so safely, where he has a reasonable belief that he is in imminent danger of death or great bodily harm, is without fault, and is in a place that he has a right to be. The rationale behind this rule comes from a policy against making a person act in a cowardly or humiliating manner." *State v. Renner,* 1994 WL 501778, at *7 (Tenn.Crim.App., Sept.12, 1994) (quoting 1 W. LaFave & A. Scott, *Substantive Criminal Law,* s 5.7(f), at 659 (1986)), *aff'd, State v. Renner,* 912 *S.W.*2d 701 (Tenn.1995).

has as much right to be in the home where the attack occurs, the duty to retreat still applies.

What this exception means for a battered woman is that as long as it is a stranger who attacks her in her home, she has a right to fight back and labors under no duty to retreat. If the attacker is her husband or live-in partner, however, she must retreat. The threat of death or serious bodily injury may be just as real (and, statistically, is more real) when her husband or partner attacks her in her home, but still she must retreat.

[Maryanne E. Kampmann, *The Legal Victimization Of Battered Women*, 15 *Women's Rts. L. Rep.* 101, 112–13 (1993).]

These are grave concerns. When the drafters of our Code of Criminal Justice commenced their work in 1971, the public was not fully aware of the epidemic of domestic violence. Knowledge of the problem, however, was more widespread at the time of the adoption of the Code in 1979. Legislative activity in the field of domestic abuse was already underway. For example, New Jersey had adopted the Prevention of Domestic Violence Act, *L.* 1981, *c.* 426 (codified at *N.J.S.A.* 2C:25–1 to –16) (repealed 1991) and the Shelters for Victims of Domestic Violence Act, *L.* 1979, *c.* 337 (codified at *N.J.S.A.* 30:14–1 to –14). However, there is no evidence that the Legislature specifically considered the loophole in the castle doctrine. As presently structured, the Code of Criminal Justice requires that a cohabitant who can safely leave the home to avoid violence should do so before resorting to deadly force. We have invariably adhered to the Code's concepts of self-defense. We have insisted, as the Code requires, that the belief of the person wielding deadly force must be a reasonable belief, not simply an honest belief. *Kelly, supra*, 97 *N.J.* at 204, 478 *A.*2d 364. Moreover, we have declined to create new justifications for criminal conduct. *See State v. Bowens*, 108 *N.J.* 622, 532 *A.*2d 215 (1987) (holding that Code did not provide independent category of imperfect self-defense); *State v. Tate*, 102 *N.J.* 64, 505 *A.*2d 941 (1986) (holding that Code did not provide defense of medical necessity to illegal possession of drugs). Only when we have been satisfied that the structure of the Code makes a defense available have we allowed it to be asserted. *See State v. Robinson*, 136 *N.J.* 476, 643 *A.*2d 591 (1994) (concluding that Code contemplates offense of attempted passion-provocation manslaughter).

There is no comparable basis for departing from the language of the Code, specifically, from the Code requirement that an actor may not use deadly force against a cohabitant if an actor may safely retreat. "The Legislature and the Executive do not decide cases ... the judiciary does not pass laws. One of the categories of legislation that the judiciary has no power to adopt is that [of] defining crimes and providing for their punishment." *State v. Cannon*, 128 *N.J.* 546, 560, 608 *A.*2d 341 (1992). Although we find present the statutory duty to retreat, we commend to the Legislature consideration of the application of the retreat doctrine in the case of a spouse battered in her own home. There are arguments to be made on each side of the issue. *See* majority and dissenting opinions in *State v. Thomas*, 77 *Ohio St.*3d 323, 673 *N.E.*2d 1339(Ohio 1997) (holding that domestic partner assaulted in her own home has no duty to retreat before using deadly force in self defense).

## C.

That leaves for resolution whether John Gartland could be considered a cohabitant of Ellen's bedroom. Put the other way, the question is whether the upstairs bedroom in which Ellen slept was a separate dwelling. It is a close question on this record but we agree with the courts below that the bedroom was not a separate dwelling.

*N.J.S.A.* 2C:3–11c defines "dwelling" as "any building or structure, though movable or temporary, or a portion thereof, which is for the time being the actor's home or place of lodging except that, as used in 2C:3–7 [concerning arrest for burglary of a dwelling], the building or structure need not be the actor's *own* home or place of lodging." (Emphasis added.) The Commentary to this section concludes that cases such as *State v. Bonano*, 59 *N.J.* 515, 520, 284 *A.*2d 345 (1971) (holding porches and thresholds within the definition of dwelling), "leave open [the question] how much further the term 'dwelling' might be extended." Cannel, *New*

*Jersey Criminal Code Annotated,* Comment 3 on *N.J.S.A.* 2C:3–11c (1996–97).

Defendant emphasizes that the Prevention of Domestic Violence Act implicitly recognizes the concept of a private dwelling within a larger home by authorizing the issuance of in-house restraining orders in its attempt to prevent spousal attacks. She also cites *State v. Coyle,* 119 *N.J.* 194, 574 *A.*2d 951 (1990) (holding landlord could not consent to search of room defendant occupied).

It is true that one building may have separate apartments. However, the idea of a dwelling is that one has an "exclusive right to occupy" a portion of a building. *State v. Silva,* 43 *Conn.App.* 488, 684 *A.*2d 725, 728 (1996), *certif. denied,* 239 *Conn.* 956, 688 *A.*2d 329 (1997). In *State v. Pontery,* 19 *N.J.* 457, 117 *A.*2d 473 (1955), an estranged couple jointly owned a summer home. The wife went there to be away from her husband. When he and other family members joined her over the weekend, she could not claim that she was under no duty to retreat from the jointly-owned dwelling before inflicting deadly force. In contrast, in *State v. Lamb,* 71 *N.J.* 545, 366 *A.*2d 981 (1976), the Court exempted a wife from a duty to retreat from her husband's attack within an apartment that she exclusively occupied. He had burst in uninvited through an unlocked door. The Court stated: "In the circumstances of this case [the] defendant's estranged husband did not have as much right to be in the apartment as [the] defendant. It was her home. [The husband] was in fact an intruder and [the] defendant was under no duty to retreat." 71 *N.J.* at 549, 366 *A.*2d 981. *See also* H.J. Alperin, Annotation, *Homicide: Duty to Retreat Where Assailant and Assailed Share the Same Living Quarters,* 26 *A.L.R.*3d 1296 (1969) (discussing homicide prosecution cases involving duty to retreat before using deadly force where persons are attacked in homes shared with assailant). In this case, there is simply no evidence that the door to the bedroom had normally been kept locked or that John Gartland did not generally have access to the room. Defendant merely testified that because of sexual dysfunction, the couple slept in separate

rooms. We cannot say that Ellen had the exclusive right to occupy this room. Hence, we agree, on this record, that the court correctly charged the statutory duty to retreat.

## IV

Did the trial court err in failing specifically to instruct the jury that the evidence that defendant was abused by the decedent could be considered in assessing her claim of self-defense?

In *Kelly, supra,* 97 *N.J.* at 197, 478 *A.*2d 364, this Court held that evidence of domestic abuse is relevant to a claim of self-defense. Specifically, the Court held that expert testimony concerning the battered women syndrome is relevant to the jury's determination of subjective honesty and the objective reasonableness of a defendant's belief that deadly force was necessary to protect herself against death or serious bodily harm. *Kelly, supra,* 97 *N.J.* at 202–04, 478 *A.*2d 364. The Court recognized that evidence of prior abuse has the potential to confuse the jury and that expert testimony is useful to clarify and refute common myths and misconceptions about battered women. The history of prior abuse was plainly relevant to the self-defense charges. In order to acquit anyone of homicide committed in self-defense, the jury must find the defendant's belief in the need to use deadly force reasonable and honest. *Kelly, supra,* 97 *N.J.* at 198, 478 *A.*2d 364. Like the elements of passion-provocation manslaughter, the elements of self-defense contain subjective and objective factors that focus, respectively, on the sincerity and reasonableness of the defendant's beliefs. Thus, defendant argues that because evidence of prior abuse is relevant to the issue of self-defense and because evidence of prior abuse is potentially confusing, it follows that the jury must be properly instructed concerning how to consider and give effect to such evidence in assessing a claim of self-defense. The trial court specifically instructed the jury to consider the evidence of prior abuse in determining the question of provocation. However, it did not specifically instruct the jury to consider evidence of prior abuse in determining the question of self-defense.

We agree that a better charge would have instructed the jury to consider the history of prior abuse in assessing the honesty and reasonableness of defendant's belief in the need to use deadly force. Our courts have always admitted evidence of a victim's violent character as relevant to a claim of self-defense so long as the defendant had knowledge of the dangerous and violent character of the victim. *State v. Carter,* 278 *N.J.Super.* 629, 651 *A.*2d 1088 (Law Div.1994) (citations omitted).

The issue arises in this case as one of plain error and the question is whether the absence of the specific instruction was such that it was clearly capable of producing an unjust result. *R.* 2:10–2. We have often emphasized that instructions to a jury are to be examined as a whole. "[P]ortions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973). A consideration of the entire jury instruction leads to the conclusion that the omission specifically to tell the jury that it should consider the history of prior abuse in connection with self-defense was largely overcome by the entirety of the instruction. Taken as a whole, the instruction could not be understood to foreclose the jury's full and appropriate consideration of the prior abuse in assessing the honesty and reasonableness of defendant's belief.

The possibility that the jury might not have considered the prior abuse in assessing the self-defense claim appears highly attenuated in this case. A major focus of the opening and closing remarks of defense counsel was that the jury could and should consider the long-standing abuse of defendant by her husband in assessing her claim of self-defense. In his opening remarks defense counsel said:

> Now this is not a case, ladies and gentlemen, where a woman who claimed to have been abused for years walked into the bedroom one night and shot her sleeping husband or set the bed on fire when he was sleeping because she couldn't take it anymore, that is not this case. This is self-defense. If Mrs. Gartland hadn't acted to defend herself that night Johnny Gartland would be on trial for murder right now, that is what the case is all about.

So, yes, there are always many dynamics at work in a case like this and you're going to have to try to understand some of them, but in the end what is the single most important reason that the evidence in this case will show as to why it's important that Johnny Gartland beat up Ellen Gartland and abused her for so many years? You know why? Because on February 8, 1993, she knew what type of violence he was capable of inflicting against her and that's why it's important. She had every reason in the world to be afraid of him because *she knew what he had done to her before. She knew what he was capable of doing* and she knew the imminency of the threats, and she saw the look when he came in the bedroom to hit her.

[Emphasis added.]

In his summation, he repeated this theme:

You see what is important, ladies and gentlemen, about the history and the context of this case is that she knew he was capable of doing serious injury to her *because he had done it before.* She knew he was capable of beating the hell out of her.... Ladies and gentlemen, in the end the history is important because that it why Ellen knew that she had a good reason to be afraid. She knew that he was capable of hurting her very badly.... He was known to be violent and abusive when he was drunk, that he had beaten his wife on occasions over a seventeen-year marriage....

[Emphasis added.]

The court's instructions did not foreclose the jury's consideration of that prior abuse; nor were its instructions so erroneous as to confuse or mislead the jury in its consideration of self-defense. The instructions gave the members of the jury an opportunity to consider fully whether an honest and reasonable belief in the necessity to use deadly force was present. The trial court explicitly told the jurors to consider passion-provocation in the context of knowing or purposeful murder. It also told the jurors that they could not find the defendant guilty of murder or any of the lesser-included offenses if they had a reasonable doubt as to whether or not the defendant had killed her victim in the honest and reasonable belief that the use of deadly force was necessary on the occasion.

V

We now turn to consider other aspects of this case that have been neither raised nor argued by the parties, that would have been grounds for retrial in the case of a living defendant.

In a long series of cases, we have held that an essential ingredient to a fair trial is that adequate and understandable instructions be given to the jury. The "charge is a road map to guide the jury and without an appropriate charge a jury can take a wrong turn in its deliberations." *State v. Martin*, 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990). We have regularly insisted that courts give content to statutory language in their charges to juries. "[A]n instruction solely in the terms of the language of the statute will [sometimes] not give sufficient guidance to the jury." *State v. Olivio*, 123 *N.J.* 550, 567, 589 *A.*2d 597 (1991).

> Model jury charges are often helpful to trial courts performing this important [charging] function. However, it is not always enough simply to read the applicable provision of the Criminal Code, define the terminology, and set forth the elements of the crime. An instruction that is appropriate in one case may not be sufficient for another case. Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case.
>
> [*State v. Concepcion*, 111 *N.J.* 373, 379, 545 *A.*2d 119 (1988).]

The instructions in this case were largely devoid of reference to the specific circumstances of the case. As noted, the trial court instructed the jury that if Mrs. Gartland "knew that she could avoid the necessity of using deadly force by retreating from that house, providing ... [that] she could do so with complete safety, then the defense is not available to her." We intend no criticism of the trial court because neither party requested a charge tailored to the facts. However, an abstract charge on the duty to retreat could only have been confusing in the circumstances of this case. Exactly where could she retreat? As we understand the record, there was no other way out of the bedroom other than the doorway where her assailant stood. The charge should have asked whether, armed with a weapon, she could have safely made her way out of the bedroom door without threat of serious bodily injury to herself. In the similar circumstances of *Thomas, supra*, 77 *Ohio St.*3d 323, 673 *N.E.*2d 1339, a woman trapped in her trailer retreated to the bathroom. Unable to escape, she ran to a closet and took out a gun. She fired two warning shots and even after being shot her assailant continued to

threaten her. The concurring judge asked, "[h]ad the defendant gotten around [her cohabitant] to the door of the small trailer, would her attempt to escape the altercation have increased the risk of her death? Would [the cohabitant] have become further enraged and tried to kill her?" 673 *N.E.*2d at 1346 (Stratton, J., concurring). These are the circumstances that a jury must evaluate. One of the problems in applying the retreat doctrine to the case of a battered woman is that the jurors may confuse the question of leaving the abusive partner with the duty to retreat on the occasion. *See* Maguigan, *supra*, 140 *U. Pa. L.Rev.* at 419 (noting "there is a tendency to blur the definition of the retreat rule with the question of whether the woman could have escaped the relationship"). Among the many myths concerning battered women is the belief "that they are masochistic and actually enjoy their beatings, that they purposely provoke their husbands into violent behavior, and, most critically . . . that women who remain in battering relationships are free to leave their abusers at any time." *Kelly, supra*, 97 *N.J.* at 192, 478 *A.*2d 364.

The charge on self-defense should also have been tailored to the circumstances of the case. In *State v. Wanrow*, 88 *Wash.*2d 221, 559 *P.*2d 548 (1977), the Washington Supreme Court recognized that its traditional self-defense standard failed to account for the perspective of abused women. Any limitation of the jury's consideration of the surrounding acts and circumstances to those occurring at or immediately before the killing would be an erroneous statement of the applicable law. *Id.,* 559 *P.*2d at 556. The Washington court held that a battered woman was entitled to have the jury consider her actions in the light of her own perceptions of the situation, including those perceptions that were the product of our nation's unfortunate history of sex discrimination. *Id.* at 559. At a minimum, the jury in Ellen Gartland's case should have been asked to consider whether, if it found such to be the case, a reasonable woman who had been the victim of years of domestic violence would have reasonably perceived on this occasion that the

use of deadly force was necessary to protect herself from serious bodily injury.

In another context, the failure to relate to the facts of the case the duty to retreat and right of self-defense might not have cut so mortally into a defendant's ability to maintain a defense on the merits. However, the persistent stereotyping of the victims of domestic violence requires special concern. Both partners to the domestic tragedy are now deceased. Although we cannot fully right past wrongs, we can correct errors in the charge that were clearly capable of producing an unjust result.

The judgment of the Appellate Division is reversed and the conviction of manslaughter is set aside.

*For reversal*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—none.