**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1827-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JERGERE E. MINAYA-ACOSTA,

    Defendant-Appellant.

_____

Argued January 23, 2024 – Decided March 8, 2024

Before Judges Natali and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 19-07-0823.

Alison Gifford, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Alison Gifford, of counsel and on the brief).

Edward F. Ray, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Edward F. Ray, of counsel and on the brief).

PER CURIAM

Tried to a jury, defendant Jergere E. Minaya-Acosta, appeals from the October 13, 2021 judgment of conviction for attempted manslaughter, endangering an injured victim, possession of a weapon for an unlawful purpose and unlawful possession of a weapon, and sentencing him to an aggregate prison term of fourteen years and eight months. Because clear errors in the jury instructions were not harmless, we reverse the conviction and remand for further proceedings.

I.

The following facts were adduced at trial. In 2019, defendant and R.C.[1] were having marital difficulties and she moved out of their apartment into her brother's apartment, which he had vacated. A short time later, she agreed to attempt reconciliation and defendant moved into the apartment with her. On April 19, 2019, which was Good Friday, R.C. left work early in the afternoon and stopped by church before going home to the apartment. At approximately 3:00 p.m., defendant arrived at the apartment and an argument ensued because he wanted her to attend church with him and she declined. Defendant gathered R.C.'s religious items and said he was going to drop them off at church, telling her, "I think . . . you're possessed, you have the devil on you." He left the

---

[1] We use initials to protect the privacy of the victim. See Rule 1:38-3(c)(12).

apartment with her belongings but returned with them a short time later. He told R.C. he was leaving her and was going to look for a room when he returned, and then left the apartment again.

At approximately 8:00 p.m., defendant returned and began playing music, which R.C. asked him to turn down. They continued to argue, and R.C. went into her bedroom and locked the door. Defendant then "popped" the door lock and entered the bedroom. From this point, the testimony diverged as to what occurred.

R.C.'s Testimony

R.C. testified defendant "snatched" her cell phone, called her names, and mocked her. He accused her of having an affair with a woman. While in the kitchen, he poured bottles of water on her, telling her to calm down. R.C. then returned to the bedroom, changed her clothes, packed a bag, and attempted to leave the apartment but defendant prevented her from doing so. He "tossed [her] around" and when she fell to the floor, he dragged her by her t-shirt and her "necklace ripped."

Over the next few hours, R.C. pleaded with defendant to let her leave the apartment but he prevented her from doing so. He barricaded the top of the stairs with several chairs and sat on one of them. R.C. tried to go over the railing

of the stairs but defendant kept pushing her back. She grabbed a wooden mortar and threatened to hit defendant with it if he did not let her leave. Defendant laughed at her and said, "oh yeah, that's great . . . something for me to tell the judge." Defendant then took the mortar away from R.C. by twisting her hand.

R.C. then picked up a paring knife.[2] Defendant took the knife from her, threw it on the floor, took the knife rack, and put "everything near him by the stairs." R.C. removed defendant's belongings from a closet, threw them in the living room, and told him if he was not happy he should leave. While going through his clothes on the floor, defendant picked up a "hook knife" with a yellow handle and put it in his rear pocket. R.C. took the knife out of defendant's pocket and threw it down the stairs, but defendant retrieved it.

R.C. then attempted to run down the stairs but defendant dragged her back up and she fell to the floor in the living room. Defendant straddled her and pinned her down with his knee and elbow. She begged him to let her go and he laughed. In trying to get away from him, R.C. flipped over onto her stomach. Defendant grabbed R.C. by her hair, pulled her head back, and sliced her neck

---

[2] R.C. denied she threatened defendant with a knife. During cross-examination, defense counsel confronted R.C. with her prior statement, wherein she said, "I had a knife and threatened him with it, but I didn't do anything with it." However, R.C. said she did not recall her prior statement.

with the knife. R.C. felt heat coming from her neck, and defendant pulled her head back again and sliced her neck a second time.

Defendant then put a pillow over R.C.'s head and pushed her head into it with his knee. She said to him, "Just let me die," and told him to cut off her St. Michael's ankle bracelet so she could "die in peace." Defendant cut the anklet off and while she lay on the floor, R.C. heard him step over her and the sound of plastic bags opening and closing.

Defendant then took a shower, turned off the lights and fan, closed the windows and shades, and left the apartment. Still bleeding, R.C. got up and knocked on the neighbors' doors for help, but no one answered. She went around the corner to a residence where a man answered the door and called 911.

Defendant's Testimony

Defendant testified R.C. started the physical altercation by picking up a piece of dental equipment and trying to stab him with it. She accidentally cut her hand on it and told defendant she was going to call the police and have him sent to jail because of the injury. Defendant said he took R.C.'s cell phone and tried to persuade her from leaving the apartment. On cross-examination, he admitted he did not allow her to leave the apartment but said he did so because it was 3:00 a.m., raining, and he was "scared about her threat to call the police"

5

about the cut on her hand. R.C. threatened him with a knife, which he knocked out of her hand and put in his back pocket.

R.C. then came at defendant with a knife in one hand and a screwdriver in the other, swinging at his face. In response, defendant swung at her with his knife and cut her neck. She lay on the floor and he put a pillow underneath her head to prop it up. She asked him to remove her ankle bracelet and he slipped it off, and she said to him, "Minaya, you killed me." He did not intend to kill R.C. and denied cutting her more than once. Although defendant did not believe she was dead, he was scared.

Defendant took off his bloodied jeans and shoes and put them in a garbage bag with the knife, showered, packed his belongings in the car, and threw out the bag. While packing his belongings, defendant observed R.C. moving and breathing, and he put a cell phone close to her so she could call for help. Defendant left the apartment without calling for help "because he panicked" and "[his] mind just got blocked." While driving to New York, defendant called the apartment property manager and asked him to check on R.C., telling him they had gotten into a fight and he had "unintentionally stabbed" her. At the manager's insistence, defendant left his car in New York, called the police and

A-1827-21

took a bus back to New Jersey. He ended up on the wrong bus route and reported to the police department in Englewood instead of Hackensack.

Defendant conceded that during the subsequent interview with police he told them that he had killed R.C.; however, at trial he testified he only made that statement because R.C. said he had "killed" her.

Other Witnesses' Testimony

A responding police officer testified he observed R.C. "holding her hands against her neck, bleeding everywhere, and she had a scarf wrapped around her neck trying to keep the . . . blood in as much as she could." Another officer observed R.C. covered in blood, describing it as "when you jump in a pool and you come out and you're totally soaked with water, but instead it was blood" on her. Inside the apartment, the officer observed bloody prints on the windowsill and door frame, R.C.'s ankle bracelet lying a pool of blood on the floor and blood on a pillow and clothing.

A Hackensack detective was dispatched to the Englewood Police Department to take defendant into custody. Defendant was read Miranda[3] rights in Spanish, placed under arrest and taken to the Hackensack Police Department. A search of a dumpster near the apartment uncovered a garbage bag that

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

contained a knife with a two-inch hooked blade, and bloodied jeans and work boots.

Dr. Stephen Cohn, the trauma surgeon who treated R.C., testified she sustained a neck wound four to five inches long and one centimeter deep, which had sliced open her trachea and required surgery to close. She also had injuries to her arms, scrapes on her elbow, a cut on her hand and bruising to her chest area. She spent a week recovering in the hospital.

## II.

On July 16, 2019, a Bergen County grand jury indicted defendant on charges of first-degree attempted murder, N.J.S.A. 2C:11-3, :5-1 (count one); third-degree endangering an injured victim, N.J.S.A. 2C:12-1.2(a) (count two); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count three); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count four); third-degree stalking for violating a court order, N.J.S.A. 2C:12-10(c) (count five); fourth-degree contempt for violating a court order, N.J.S.A. 2C:29-9(a) (count six); and fourth-degree contempt for violating an order entered under the Prevention of Domestic Violence Act, N.J.S.A. 2C:29-9(b)(1) (count seven).[4]

---

[4] Counts five, six and seven were dismissed prior to trial.

On July 29, 2021, the court held a hearing pursuant to N.J.R.E. 104 on the State's motion to admit the statements made by defendant during his police interview on April 20, 2019. Defendant had been interviewed by Officer Ionnis Papanikolaou, with Officer Felix Katasaroans interpreting from English to Spanish and vice versa. On August 3, 2021, the court issued an opinion and order finding issues with the <u>Miranda</u> warnings given to defendant:

> Papanikolaou read the words "I have read the above statement of my rights and they have been read aloud to me. I understand what my rights are, I am willing to answer questions without an attorney present. No promises or threats have been made to me and no pressure or coercion has been used against me."

> Katasaroans did not translate said statement, instead Katasaroans replaced that statement with an explanation of his understanding of what Papanikolaou had said. Katasaroans stated[,] "Right now he (Papanikolaou) is telling you that you now have read all of this and you understand that you are going to speak to us and we are not giving you anything, meaning there is nothing bad talking to us."

> This dialogue suggests that the defendant might have understood that nothing bad would happen to him if he were to speak with the officers. That is completely contrary to the message that a defendant be given when receiving <u>Miranda</u> warnings.

> At another moment the defendant asked[,] "Like here, like it says up here, this is to sign away the rights, like my right that I am giving up[,]" at which point Katasaroans interrupted the defendant. The officers did

not make sure that the defendant finished his question. The defendant never received an answer yet the officers had him sign the <u>Miranda</u> form.

Although the court found defendant did not knowingly waive his <u>Miranda</u> rights, it ruled the statement could be used for impeachment:

> A statement acquired contrary to a defendant's <u>Miranda</u> rights may still be admissible for impeachment purposes if made voluntarily. The jurisprudence is based upon the equally compelling goals of fairness at trial and a result based upon truth. <u>State v. Burris</u>, 145 N.J. 509, 533-34 (1996).

The court found there were significant interpretation issues throughout the interview. The interpreter "paraphrased" questions instead of directly interpreting and, when defendant asked for clarification, the interpreter "instructed [defendant] as to what Katasaroans thought Papanikolaou had asked." The court deemed inadmissible those portions of the interview it found "confusing and misleading," and left further determinations of admissibility to the time of trial.

Trial before a judge and jury was conducted from August 16 to 23, 2021. Defendant invoked self-defense, contending that if the State proved he used or threatened to use force against R.C. he only did so to protect himself. During the charge conference, both counsel agreed the court would read the jury charge

10

on self-defense. The judge charged the jury consistent with the model jury charges, including the following pertinent provisions:

> Even if you find that the use of deadly force was reasonable, there are limitations on the use of deadly force. If you find that the defendant with the purpose of causing death or serious bodily harm to another person provoked or incited the use of deadly force against himself in the same encounter, then the defense is not available to him. If you find that the defendant knew that he could avoid the necessity of using deadly force by retreating, provided that the defendant knew he could do so with complete safety, then the defense is not available to him.

> A dwelling includes a porch or other similar structure. In your inquiry as to whether a defendant who resorted to deadly force knew that an opportunity to retreat with complete safety was available, the total circumstances, including the attendant excitement accompanying the situation, must be considered.

> The burden of proof on this subject. The Stat[e] has the burden to prove to you beyond a reasonable doubt that the defense of self-defense is untrue. This defense only applies if all the conditions or elements previously described exist. The defense must be rejected if the State disproves any of the conditions beyond a reasonable doubt.

> The same theory applies to the issue of retreat. Remember, that the obligation of the defendant to retreat only arises if you find that the defendant resorted to the use of deadly force. The burden of proof is upon the State to prove beyond a reasonable doubt that the defendant knew he could've retreated with complete safety.

A-1827-21

If the State carries its burden, then you must disallow the defense. If the State does not satisfy this burden and you have—and you do have a reasonable doubt, then it must be resolved in favor of the defendant and you must allow the claim of self-defense and acquit the defendant.

The model jury charge also includes the following passage, which appears in between the first two paragraphs above: "[CHARGE WHERE APPLICABLE: An exception to the rule of retreat, however, is that a person need not retreat from his or her own dwelling, including the porch, unless he/she was the initial aggressor. A dwelling includes a porch or other similar structure.]." Model Jury Charges (Criminal), "Justification – Self Defense (In Self Protection), N.J.S.A. 2C:3-4," at 3 (rev. Nov. 13, 2023)[5] (footnotes omitted). Although it was applicable here, this provision was not discussed during the charge conference nor did the court read this additional instruction to the jury.[6]

---

[5] This revision did not alter the section on self-defense.

[6] During the charge conference, the court referenced a provision of the proposed jury instructions regarding duty to retreat: "It says: 'If the defendant does not resort to the use of deadly force, one who is unlawfully attacked may hold his position and not retreat.' That's not really applicable anymore. I think that should come out." Both counsel agreed to remove that portion of the instruction, presumably because deadly force had been used.

The judge also charged the jury regarding R.C.'s prior inconsistent statements. On cross-examination, defendant denied he thought he killed R.C., and at sidebar, the State informed the court of its intention to impeach defendant with the prior statement he made to police that he had killed R.C.

The following exchange occurred on cross-examination:

> [PROSECUTOR]: In [the April 20, 2019 statement to Hackensack police], you told police multiple times, that you thought you killed [R.C.], didn't you?
>
> [DEFENDANT]: Because of what she herself told me. She said, Minaya, you killed me.
>
> [PROSECUTOR]: You told the police you thought she was dead, didn't you?
>
> [DEFENDANT]: Yes, I'm saying, again, I said, wow, I killed [R.C.], because I was guided—led by what she was saying.

Defendant made another inconsistent statement about whether R.C. asked to leave the apartment. He testified on direct examination he was not blocking the stairs because R.C. never asked to leave. At sidebar, the State informed the court it intended to impeach defendant with the statement he made to police wherein he admitted not allowing her to leave. The court instructed the State to provide the statement it intended to use, and the State pointed to several portions of the statement where defendant admitted he prevented R.C. from leaving the

apartment. Despite having this discussion at sidebar, the State did not impeach defendant on this issue.

Contrary to its order on the <u>Miranda</u> hearing, the court did not instruct the jury that it was only permitted to use defendant's prior inconsistent statements to evaluate his credibility. Instead, the court instructed the jury it was permitted to consider defendant's prior inconsistent statements as substantive evidence.

The court instructed:

> Evidence, including statements by a witness, prior to the trial showing that at a prior time a witness had said something, which is inconsistent with the witness' testimony at trial, may be considered by you for the purpose of judging the credibility of a witness. It may also be considered by you as substantive evidence; that is, proof of the truth of what was stated in the prior contradictory statement.
>
> Evidence has been presented showing that at a prior time two people who testified before you said something which is inconsistent with the testimony that you heard at the trial. This evidence may be considered by you as substantive evidence or proof of the truth of the prior contradictory statement or omitted statement.

The court further provided the jury an example of a prior inconsistent statement, referencing the statement defendant made to the police:

> [I]n regard to the testimony of [defendant] on direct examination he testified that he never . . . prevented [R.C.] from leaving the apartment.

A-1827-21

However, on cross-examination inconsistencies were shown between his prior statement and that testimony.

The State, however, had not impeached defendant as to this issue.

On August 23, 2021, the jury found defendant guilty of second-degree attempted passion/provocation manslaughter as a lesser included offense of attempted murder, third-degree endangering an injured victim, third-degree possession of a weapon for an unlawful purpose and fourth-degree unlawful possession of a weapon. On October 8, 2021, he was sentenced to an aggregate prison term of fourteen years and eight months.

This appeal follows, in which defendant presents the following issues for our consideration:

> POINT I
> REVERSAL IS REQUIRED BECAUSE THE COURT IMPROPERLY INSTRUCTED THE JURY ON THE DUTY TO RETREAT; A PERSON ATTACKED INSIDE THAT PERSON'S OWN DWELLING HAS NO SUCH DUTY.
>
> POINT II
> THE COURT FAILED TO EXPLAIN THAT THE PRIOR STATEMENTS OF THE DEFENDANT COULD BE USED ONLY TO IMPEACH HIS CREDIBILITY.
>
> POINT III
> THE REPEATED DESCRIPTION OF R.C. AS THE "VICTIM" BY THE STATE'S WITNESSES DIMINISHED THE PRESUMPTION OF

15

DEFENDANT'S INNOCENCE AND DEPRIVED HIM
OF A FAIR TRIAL.

POINT IV
THE CUMULATIVE IMPACT OF THE ERRORS
DENIED DEFENDANT A FAIR TRIAL.

Because we agree the jury was incorrectly charged on the duty to retreat and the use of prior inconsistent statements, and these errors were clearly capable of producing an unjust result, we are constrained to reverse the conviction. In light of this disposition, we need not reach the other points raised by defendant.

## III.

It is well settled that "[a]ppropriate and proper charges are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (alteration in original) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). Jury instructions must give "a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." Id. at 159 (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). The charge must also be read as a whole and not just the challenged portion, to determine its overall effect. State v. Garrison, 228 N.J. 182, 201 (2017).

If, like here, defense counsel did not object to the jury charge at trial, the plain error standard applies. State v. Singleton, 211 N.J. 157, 182-83 (2012).

16

Plain error is error that is "clearly capable of producing an unjust result." Id. at 182; see also R. 2:10-2. In terms of its effect in a jury trial, the error must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

N.J.S.A. 2C:3-4(a) provides "the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." This justification is not without limit. N.J.S.A. 2C:3-4(b)(2), states in relevant part:

> The use of deadly force is not justifiable under this section unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm; nor is it justifiable if:
>
> (a) The actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter; or
>
> (b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take, except that:

> (i) The actor is not obliged to retreat from his dwelling, unless he was the initial aggressor.[7]

Defendant contends, when viewing the evidence in the light most favorable to him and consistent with his testimony, R.C. attacked him with a screwdriver and knife, and he responded by defending himself with a knife.

The State concedes the jury charge was incorrect but argues the duty to retreat was immaterial to any issue at trial and not plain error because defendant was the initial aggressor. The State also contends it "disproved self-defense because it was not conceivable that defendant, who did not have a scratch on him, dodged R.C.'s attack and simultaneously caused a five-inch laceration on her neck with a knife that only had a two-inch blade."

Here, the jury heard two different versions of the incident and was charged with deciding those issues of fact. According to defendant, R.C. escalated the argument into a physical altercation by threatening him with first a mortar and then a knife, both of which he wrested from her. She then "came at" him again

---

[7] Prior to 1999, a resident of a dwelling had a duty to retreat when attacked by a cohabitant. See State v. Gartland, 149 N.J. 456 (1997). Because of the concerns this duty caused in the context of domestic violence, the Legislature abolished it, except where the actor was the initial aggressor. See L. 1999, c. 73, § 271.

with a knife in one hand and a screwdriver in the other, swinging at his face, and he slashed at her with a knife in defense of himself.

We are unpersuaded by the State's arguments because they are premised on factual determinations within the province of the jury, to be made after it has been properly charged. If the jury believed even part of defendant's version, it could have found R.C. escalated the verbal argument to a physical altercation, to which he responded in self-defense. But because the charge imposed on defendant a duty to retreat, the jury was foreclosed from considering self-defense based on the facts presented. This critical error raises reasonable doubt on whether the jury reached a result it otherwise might not have reached.

We next turn to the jury charge regarding prior inconsistent statements. Defendant contends the incorrect charge warrants reversal because the jury was permitted to consider defendant's statements that he killed R.C. as substantive evidence, which was clearly capable of impacting the jury's deliberations.

The State concedes the jury instruction was incorrect but submits the error is not of reversible proportion because defendant's belief after the fact was immaterial to the determination of whether he purposely attempted to cause her death. The State also argues defendant's statement to police was not wholly inconsistent with his testimony, which lessens the prejudice of the error.

After finding the <u>Miranda</u> warnings were insufficient, the court determined the statements could nevertheless be used to impeach defendant if he were to testify at trial. Our Supreme Court cautioned in those instances "the jury should be instructed as to the limited consideration it may give to the statement and its contents." <u>State v. Miller</u>, 67 N.J. 229, 233 (1975). We recognize the State did not use this information in presenting its case-in-chief and did not reference the statement in its closing argument. However, the court's instruction nevertheless told the jury it was permitted to use the statement as proof of guilt, and we presume it followed the court's instruction.

Although defendant's statement that he killed R.C. did not directly prove an element of manslaughter, we have little doubt it had the capability of impacting the jury's determination whether defendant purposely attempted to cause her death. Because this highly prejudicial statement to police impacted the jury's consideration of whether he was guilty of the charged offenses, the improper jury instruction was clearly capable of producing an unjust result.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

20