**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1687-17T2

STATE OF NEW JERSEY,

 Plaintiff-Appellant,

v.

VIRGINIA A. VERTETIS,

 Defendant-Respondent.

Argued February 24, 2020 – Decided March 18, 2020

Before Judges Sabatino, Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 14-08-0797.

James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; James K. Smith, Jr., of counsel and on the briefs).

Paula Cristina Jordao, Assistant Prosecutor, argued the cause for respondent (Frederic M. Knapp, Morris County Prosecutor, attorney; Paula Cristina Jordao, on the brief).

PER CURIAM

This case involves the shooting death of Patrick Gilhuley, a private security worker and retired New York City police officer, by his estranged significant other, defendant Virginia Vertetis.

The State contended defendant shot Gilhuley out of jealousy because he dated multiple women. It further contended she acted out of anger because her attempts to maintain their relationship through sex and threats had failed. Defendant claimed she shot Gilhuley in self-defense after he had assaulted and threatened to kill her in her home. After a month-long trial, the jury rejected defendant's self-defense claim and convicted her of first-degree murder and unlawful possession of a weapon.

On appeal, defendant challenges her conviction on the grounds that: (1) the trial court failed to instruct the jury that she had no duty to retreat in her own home (the "castle" doctrine) and instead told the jurors that she had a duty to retreat that could nullify her claim of self-defense; (2) the court provided a factually imbalanced N.J.R.E. 404(b) charge that unfairly favored the State; (3) the court erroneously allowed hearsay testimony under N.J.R.E. 803(c)(3) and provided an improper charge on the use of that evidence; (4) the prosecutor's summation denied her a fair trial; and (5) she is entitled to a new trial on the basis of cumulative error.

2

For the reasons that follow, we reverse and remand for a new trial because of critical flaws in the jury instructions on the central issue of self-defense.

## I.

To provide context, especially for the key issues of intent and self-defense, we discuss the evidence in considerable detail.

## A.

The Couple's Relationship

Defendant, who was an elementary school teacher, and decedent began dating in the spring of 2008. According to defendant, the relationship had its "ups and downs" and the couple broke up and reconciled several times.

In early January 2014, after the couple took a short vacation to Las Vegas, the relationship "plummeted." Defendant believed they were broken up, though she hoped they could work through their problems. The couple continued to communicate from January to February 2014. Defendant spent an extended weekend at decedent's apartment in Staten Island in early February 2014. They did not see each other again until March 3, 2014, the night that defendant shot and killed him.

Decedent's Calls to His Daughter Jennifer on the Night of the Shooting

Just before 10:00 p.m. on March 3, 2014, police responded to a 9-1-1 call

A-1687-17T2

from decedent's adult daughter, Jennifer Gilhuley ("Jennifer").[1]  Her call was prompted by a series of three brief calls that decedent had made to her while she was at home in Staten Island.  The first call came in at 9:38 p.m., the second at 9:40 p.m., and the third at 9:42 p.m.

When Jennifer answered the 9:38 p.m. call, she heard her father "screaming 'She is hitting me.  She is hitting me.'"  Then he repeatedly yelled "stop" before the call ended.  Jennifer believed that he was referring to defendant because he had told Jennifer in February 2014 that he was breaking up with defendant and that she was not handling it well.  Jennifer said that it was not uncommon for her father and defendant to break up and get back together, but this time he said it was "different."

Jennifer assumed her father was calling from his Staten Island apartment, and she intended to quickly change her clothes and go there to help him.  At 9:39 p.m. she sent him a text message saying:  "I'm coming."  Before Jennifer had time to change, she received the 9:40 call.  Decedent did not say anything when Jennifer answered, but she heard yelling that sounded far away.  This second call lasted forty-four seconds before ending.

---

[1]  We use first names to make clear the references to the various family members with common surnames and intend no disrespect.

A-1687-17T2

Two minutes later, at 9:42 p.m., Jennifer answered the third call. She testified that it "sounded like he [decedent] was running, because he was out of breath." According to Jennifer, she said: "Dad, I'm coming," and he said: "You won't get here in time," which led her to believe he was not at his apartment. She asked him if he was in New Jersey where defendant lived, and he said yes. As she started to ask what he was doing there, she heard "three loud shots" and her father say: "Holy shit. She is shooting." Then the call ended.

Jennifer's Actions After the Calls

Jennifer called 9-1-1 and reported that her father was having a dispute with his girlfriend and that his girlfriend was shooting at him. She tried to call her father, but he did not answer. At 10:01 p.m., she sent him a text message: "The police are on their way." He did not respond.

Police Respond to Defendant's House

Several members of the Mount Olive Police Department, including Sergeant Amy Clymer, Detective Hunter Guiles, and then-Officer (now Detective) Eric Krouse arrived at defendant's house shortly after 10:00 p.m. As they approached the front door, they saw a small black bag or briefcase, later identified as decedent's, outside on the front step. There was a gunshot hole in the front door and shattered glass on the step. Lights were on in an upstairs

bedroom, the front foyer, and the kitchen, which was located behind the dining room on the left side of the house. Detective Krouse saw someone walk past a window in an upstairs bedroom. Seconds later, he and Sergeant Clymer saw a female walk by the dining room window towards the kitchen. She appeared to be holding a phone.

The officers forced open the front door and announced their presence. Decedent's body was lying in the foyer between the door and the stairs to the second floor. He was on his back, with his arms to his sides and his feet facing the front door. The officers pushed him slightly to the side so they could enter. His eyes were open, and he was fully clothed. On the stairs behind him was a revolver, later identified as the service weapon he received when he first became a police officer. Decedent had blood that was beginning to dry around his nose and mouth, and his heart was not beating. According to Detective Guiles, it "[f]elt like he had been there for a while." Sergeant Clymer attempted to administer CPR and then called for paramedics.

As Detectives Krouse and Guiles secured the house, they found defendant kneeling in a fetal position in the kitchen, holding a cordless telephone and crying. They yelled for her to show her hands, but she did not respond. Guiles physically restrained her on the ground and placed her in handcuffs.

A-1687-17T2

Unbeknownst to the officers, defendant had called 9-1-1 as they were entering her home, and the 9-1-1 operator had answered the call as police arrested defendant. The 9-1-1 recording captured defendant saying to police: "Somebody was breaking into my (inaudible) . . . "

Guiles said: "Cuffs. Cuffs. Cuffs" as he placed defendant in handcuffs. Then defendant said: "I didn't know he was coming into my house. I was . . ." The recording ended, but defendant continued to say that she lived alone and that she was upstairs asleep when someone broke into her house.

Paramedics arrived shortly after defendant was arrested. They were unsuccessful in their attempt to revive decedent.

Defendant's Conduct at the Police Station

At 10:30 p.m., police placed defendant in a patrol car and transported her to the police station. She wore pajama pants that were on backwards, a sports bra and a sweater. She repeatedly asked about decedent and whether he was okay, but no one gave her any information.

Defendant was initially held in the police station processing area where she was handcuffed to a chair. A nurse examined her, and according to the nurse's record, defendant did not say that she had been assaulted or that she was in any pain. Defendant signed the nurse's report confirming it was accurate.

A-1687-17T2

At approximately 1:00 a.m., defendant was placed in an interview room that had a table and chair with a video camera, which allowed police to watch and record her movements and statements. She was not handcuffed while in this room. She repeatedly asked about decedent and at one point said: "I just want to die. That gun was meant for me . . . I loved [him] so much."

At another point, defendant sat in the chair and placed her hands and lower arms under the table, out of the camera's view, and appeared to rub her lower arms or the top of her legs. She also dipped a paper towel into a glass of water and onto her tongue and rubbed the paper towel against her lower back as if to wipe something away. Police asked her to stop rubbing her arms and wiping her back, and she complied. Later testing showed decedent's blood on the paper towel. Decedent's blood was also found on the waistband of defendant's pajama pants, in the area where she had wiped the paper towel.

After defendant rubbed her arms or legs under the table, she asked police to photograph her arms. At about 5:00 a.m., Detective Rosemary Cicerone-Brown of the Morris County Sheriff's Office photographed various parts of defendant's body, and the photos were shown to the jury. According to Detective Cicerone-Brown, defendant had a few scratches on her face and back, scratches on her arms, and slightly discolored skin under her chin.

<u>Defendant Taken to a Hospital and Then the County Jail</u>

At approximately 2:00 p.m., police transported defendant to a hospital because she requested her medication, and the police were not authorized to administer it. Hospital staff asked defendant if she had been subjected to any domestic violence, and she answered no. They asked if she was in any pain and whether she had experienced pain in the last twenty-four hours, and she answered no to both queries. Staff examined her neck and back and noted no tenderness or complaints of soreness.

Thereafter, defendant was taken to the jail. Dolores Mann, defendant's attorney at the time, requested permission to photograph her body as evidence of her alleged injuries. Mann was not immediately granted permission, and it was not until March 11, 2014, that her investigator was able to take the photographs. All of them were shown to the jury and admitted as evidence.

<u>Investigation of the House</u>

Detective Supervisor Michael Gomez of the Morris County Prosecutor's Office entered defendant's home shortly after the shooting. According to Detective Gomez, the house was orderly, and nothing was broken except the glass of the front storm door and a "car remote" or "key fob for a car," which was on the floor next to decedent. Inside the right front pocket of decedent's

jeans was his cellular phone. There was a blood stain above the pocket that held the phone.

Inside the briefcase left outside the front door, police found two loaded semi-automatic guns that belonged to decedent, along with condoms, Viagra, and personal toiletry items. These two guns and the revolver on the step inside the house were the only weapons found on the property that night. Defendant and the State stipulated that all recovered shell casings came from the revolver. Defendant testified that she did not know that decedent had brought his briefcase with the guns to her house or that he had left them outside.

In the laundry room near the kitchen, the washing machine was running and there was a spilled bottle of laundry detergent. Inside the washing machine was a pair of pink pajama pants that matched the sports bra defendant had been wearing. The pants had a yellow stain that was later examined for blood, but the test was inconclusive.

In the kitchen, defendant's coat was hanging over a chair with her cellular phone inside a pocket. Her pocketbook was on the kitchen table. Two empty and four full beer bottles were on the counter.

In the master bedroom, which was directly to the left of the stairs on the second floor, the bed was made but someone had pulled down one corner of the

A-1687-17T2

blankets. On the nightstand were various sex toys.

In the master bathroom, which was connected to the master bedroom, police found a piece of chipped wood from the vanity on the floor, along with one bullet. The shower and tub were wet, as if someone had recently run the water.

Investigator Ryan's Findings

Howard Ryan, a Morris County Forensic Operations Specialist, testified as the State's expert in crime scene and shooting reconstruction. According to Ryan, on the sloped ceiling of the stairs that led to the second floor, there was an "impact mark" that was consistent with a bullet hole. Police enlarged the hole and determined that the bullet found in the bathroom had caused this hole in the ceiling.

Gunpowder residue was found at the top of the stairs against the wall closest to the master bedroom. Ryan believed that the gun that caused the residue was shot in "close proximity" to the wall, because, he said that gunpowder does not travel more than six-to-seven feet. There were also marks on the lower part of the stairwell ceiling, apparently caused by a bullet that was shot from the top of the stairs.

The wall of the foyer near the front door had a small hole where police

recovered a bullet lodged in the drywall. Based on the shape of the entry hole, Ryan determined that this bullet was "tumbling" when it entered the wall, which meant that it had struck something before it entered the wall. Given the path the bullet had traveled, Ryan believed that it, too, had been shot from the top of the stairs.

Police also found a bullet hole in the front door. Ryan believed that bullet traveled from the top of the stairs, through the front door, and out the storm door, shattering the glass.

The Medical Examiner's Findings

The State's Medical Examiner, Ronald Suarez, M.D., examined decedent on the day after the shooting. Dr. Suarez reported that decedent weighed 250 pounds and was six feet two inches tall. Decedent's eyes appeared normal, and he had no bruises or injuries to his head or face. The toxicology report concluded that decedent's blood alcohol level was .28 and that he had taken Viagra.

Dr. Suarez recorded the following minor injuries he found on decedent's body: a purple and yellow bruise on the right side of decedent's chest; a purple bruise on the inside of his left arm; a red bruise on the ball of his left hand; an abrasion on the ball of his right thumb; "little red bruises . . . on the back of the

A-1687-17T2

tips of the index and middle fingers of the left hand"; a "scrape with some bruising" on the "back of the right elbow"; "questionable" bruising to the top of his right shoulder; and a small red bruise above his right knee. Photos of his injuries were shown to the jury as evidence.

Notably, decedent had four gunshot wounds on the upper part of his body. Dr. Suarez could not determine the order in which those four bullets were shot, or in which they had hit decedent. He designated them "Bullets A through D" for the sake of identification, not based on order of entry.

According to Dr. Suarez, Bullet "A" entered the back of decedent's right arm in the tricep region "a little bit above the elbow," traveled horizontally through his bicep and exited the front bicep. This bullet completely shattered decedent's elbow. According to Dr. Suarez, the injury would have rendered him unable to use his right arm to hold a phone to his ear or place it into his pocket.

Bullet "B" entered decedent's back, five inches below the top of his right shoulder and exited the front of his shoulder. It did not hit bone and stopped in the chest cavity. The injuries it caused were not fatal, because soft tissue within the chest cavity closed around the bullet and stopped it from causing serious damage.

Bullet "C," however, caused what Dr. Suarez termed "immediate life[-

13

]threatening injuries," which would have been "difficult to survive." This bullet entered decedent's back five-and-one-half inches below the top of the right shoulder. It exited the front of his body to the left at a downward angle. The bullet fractured a rib, tore the top of the right lung, tore a main vein attached to the heart and "one of the main air passages" to the left lung, "passed through the main artery," which transports blood to and from the lung and heart, and traveled through the space between the third and fourth ribs before exiting the front of the body.

Lastly, bullet "D" grazed the middle of decedent's neck horizontally without penetrating or perforating the skin. The bullet traveled from right to left and back to front. Dr. Suarez testified on cross-examination that he could not determine whether decedent was turning when this bullet grazed his neck. He noted the shooting was "dynamic," in that decedent, defendant and the gun were all moving in a very short period of time.

Decedent also had what appeared to be an abrasion that tore off part of the top layer of skin on the thumb of his right hand. Dr. Suarez testified that this wound "could be consistent with a graze wound" from a bullet, but he did not opine in his report that it was so caused. He described it in his report only as an "abrasion." If it was caused by a bullet, Dr. Suarez believed the bullet would

14

have traveled from the front to the back of the hand.

Based upon all of this forensic evidence, Dr. Suarez concluded that decedent died as a result of homicide caused by four gunshot wounds.

Ryan's Expert Opinions About the Bullets

Ryan testified that no bullet residue or "stippling" was found around the bullet holes on decedent's jacket or on his skin, which led Ryan to believe the gun that killed him was not fired at close range. Based on the nature of decedent's injuries, Jennifer's testimony regarding his phone calls to her, and phone records that corroborated her testimony, Ryan opined that the injuries occurred while decedent was traveling down the stairs, holding his phone to his ear.

Using string, Ryan plotted the flight path of the bullets fired from the top of the stairs. He agreed with Dr. Suarez that one could not determine the exact sequence of the shots, based on the evidence. A photograph of the strings demonstrating the supposed flight path was shown to the jury.

Ryan saw no evidence that defendant was "on the defensive" when the shooting occurred. In his opinion, the photographs of defendant taken shortly after the shooting showed no "glaring injuries."

Ryan believed the graze wound to decedent's right hand was caused by a

A-1687-17T2

bullet. Using his own cell phone, Ryan demonstrated for the jury how the injuries to the hand and neck would have occurred.[2] Ryan testified that he could not determine definitively which hand decedent had used to hold the phone. However, he opined that the bullet flight path "line[d] up almost perfectly" if decedent had held it with his right hand as he descended the stairs.

Ryan did not believe it plausible "at all" that decedent, as defendant contended, was traveling up the stairs, holding the railing with his left hand and reaching up towards defendant with his right hand when the bullet grazed his thumb. If that were the case, decedent would have had to stretch his arm "all of the way over here in front of him, in a very awkward position on a very confined space on the stairwell." Ryan also did not believe that decedent was the person who had placed the phone in his right pocket during or after the shooting, noting that defendant "had a lot of time alone with the deceased" before police arrived.

Text Messages and Other Phone Call Evidence

Anthony Mauceri, a lieutenant from the Morris County Prosecutor's Office, testified that between February 1, 2014 and March 4, 2014, defendant and decedent had communicated many times by phone, and exchanged 384 text

---

[2] We cannot tell from the transcripts exactly what movements Ryan demonstrated.

messages.  The relevant voicemails and text messages were read into the record.

Many of these communications followed a pattern in which defendant was professing her love for decedent while pleading with him to see her and talk to her, decedent's refusing to reconcile while accusing defendant of "snooping" on his phone and "harass[ing] everyone," and defendant insisting that she loved him and accusing him of "killing" her, "crush[ing]" her and "constantly cheating" on her.  Defendant discussed with decedent the good times they had shared, and television shows they had liked to watch together, sometimes sending a text to remind him that certain shows were on the air.

About three weeks before the shooting, on February 10, 2014, defendant asked decedent if everything was okay because he did not text her the night before to let her know that he had gotten home safely.  He responded with a simple "yes."  She then told him that she was leaving for a doctor's appointment in the city and wrote:  "Wish I was going to see your hotness along the way! . . . Love you."  That afternoon she texted a photograph with the following message:  "This was one of the top two best times I had with you! . . . The play was amazing and dinner was an alcohol happy good time!"  He responded, "Very nice."  She then wrote:  "Oh I forgot the rocking outstanding sex after.  That's really why I want to keep you around.  Nobody but nobody gives it like you do!

LOL!"

The following day, on February 11, the couple exchanged a number of acrimonious messages in which decedent threatened to contact defendant's mother and school, and defendant accused him of never really loving her. The communication ended with defendant writing: "You are [sic] bad luck is just beginning for how you've treated me." The following day, she sent decedent an unprompted message telling him that she forgave him for the way he had treated her the night before and requesting that he talk to her.

On February 16, defendant asked decedent to come over to her house and said they could be "friends with benefits." The next day she asked: "Can I interest you in coming out Sat[.] to go drink and dancing at the barn. And then a fashion show after." Decedent called her shortly after that.

On February 19, defendant urged him to come see her. She wrote at 8:39 p.m.:

> Hey you, . . . Stop pretending you are an old man. I'm sure you have been using your V and having crazy, kinky sex with toys, slutty outfits, . . . I know you. That is one of the things I love about you. With that being said, bring the toys and the V with you Sat. I want the multi-hour, all over the house, fuck marathon. . . . No ties and no commitments. Like I told you in the restaurant five years ago, I just want your sex.

The following day, on February 20, defendant asked decedent if he wanted

A-1687-17T2

to go to a basketball game "before the fashion show." He responded that he did not know if he would be out of work in time to make the game. On Friday February 21, she wrote: "Please try to get here as fast as you can tomorrow. Coors Light still believes." She attached a photograph of a Coors Light advertisement and a photograph of herself naked. On February 22, she wrote: "I'm getting happy feet! . . . Want to look at jet skis with me tomorrow?" and attached a photograph of sex beads. She then tried to reach him repeatedly and asked whether he wanted to get dinner and watch a movie.

On February 23, defendant left decedent a voicemail saying: "Please Patrick call me back. Please don't do this to me again. You know what? If you are dating Colleen and you guys are a couple, then just tell me that, but if you don't have anything going with anybody, then what is the difference?" They spoke on the phone after that. A couple of hours later she sent him a text reminding him about a television show that he should watch. The communications from this point until March 3 were similar; defendant repeatedly requested that he see her and speak to her while sending him provocative photographs of herself and referencing the "special activities [she] had planned for [him]."

Decedent's Expressions of Fear to his Friend Luongo

19

According to John Luongo, decedent's friend and employer for ten years, decedent and defendant had a "very rocky" relationship. As a result, decedent sometimes stayed at a hotel in New York City instead of going home after work because he feared that defendant would be waiting for him. When decedent spoke to Luongo about defendant, Luongo always told him to end the relationship.

On the day of the shooting, decedent showed Luongo and coworkers text messages that he was receiving from defendant, and said, "she is going to kill me someday." Again, Luongo told him to break up with her. According to Luongo, decedent "laughed" it off as he usually did; "[n]othing bothered him."

On cross-examination defense counsel established that defendant had made no calls nor written any texts to decedent on the afternoon of the shooting and questioned whether decedent was referring to defendant when he said: "[S]he is going to kill me someday." Luongo responded:

> You know, Counselor, he told me -- if he told me once, he told me a hundred times that she is going to kill me someday. That is over the course of the relationship. I don't know if it was during that year, two years before, three years. But I told him a number of times to end it. And he got to a point where I would argue with him so much about it he didn't bring it up with me anymore.

Luongo also testified that on the night of the shooting, decedent left a voicemail message on his telephone at 9:28 p.m., ten minutes before decedent made the first call to Jennifer. Luongo was in bed at the time and did not listen to the message until 4:00 a.m. when he woke. Luongo could not understand the message, as "[i]t was kind of garbled." He thought decedent "was in a bad area." He planned to return decedent's call in a couple of hours, but then learned that decedent had been killed.

Decedent's Call to Defendant's Mother

Also at 9:28 p.m., presumably after leaving a message for Luongo, decedent called defendant's mother, Cranie Koellhoffer, who lived in Florida. Koellhoffer testified that the call surprised her because she had not spoken to decedent for at least a year. Koellhoffer and decedent did not have a good relationship because he drank excessively, and she did not like his behavior when he was intoxicated. When she answered the phone, he told her that she needed to talk to her daughter because he needed to go home. He sounded intoxicated and "gruff" or "stern." Koellhoffer heard defendant crying in the background and she asked decedent to hand the phone to defendant, but the call ended.

Koellhoffer testified that she had been concerned about defendant earlier

21

that day because the school board had denied defendant's request to return to work part-time. According to her mother, defendant was also struggling with depression and issues with her teenage son, who had recently moved out of defendant's house to live with his father.

Later in the trial, defendant explained that she had been on medical leave from her teaching job since November 2013 for illnesses that compromised her immune system, and she was upset that the school denied her request to work part-time. She also suffered from a major depressive disorder, which she treated with medication and intensive outpatient therapy.

Koellhoffer testified that she had tried to talk to defendant a number of times on March 3 and had left her a voice message asking if she was okay, but defendant did not return her call. Defendant sent her a text message saying that she was "feeling down" and was unable to talk.

Decedent's Discussions with Other Co-Workers

John Denora was another coworker and friend of decedent who testified that decedent often confided in him and other coworkers regarding his tumultuous relationship with defendant. At various times decedent showed Denora text messages from defendant, and Denora thought many of them were "a bit off and a bit much." He was also aware that decedent dated other women,

A-1687-17T2

including Colleen Roper, who was a union carpenter he and decedent had met at a worksite in New York City.

On March 3, 2014, decedent told Denora that "he felt like things were getting crazy" with defendant. He planned to go to her house that night "to do the right thing and end the relationship properly," which meant in person. Denora agreed that it was time to do that.

That night, Denora had a couple of missed calls from decedent between 9:38 and 9:39 p.m. One call resulted in a brief voicemail. Denora could not understand any words in the message, but he heard a female yelling in the background. He assumed it was defendant.

Raymond Stein, another coworker and friend of decedent's, testified that between February and March 2014 decedent told him that his relationship with defendant "was strained" and that she "needed help." Decedent feared that "defendant was going to do something stupid and he wanted to move on from the relationship." At 5:22 p.m. on March 3, 2014, decedent called Stein and said that he was driving to defendant's house to break up with her because "he wanted to move on," and defendant "was not acting right. There was something about her that wasn't right."

Other Witnesses

Decedent's brother Paul Gilhuley ("Paul") testified that at approximately 4:00 p.m. on March 3, 2014, he spoke with decedent on the phone, and decedent told him that he was going to break up with defendant in person that night because the relationship was "just getting crazy." Defendant contacted him "constantly" and repeatedly asked him to work with her through their problems. Paul warned him against going to her house, but decedent said he wanted to see her and make sure she was okay. Decedent was concerned about her behavior and her physical and mental health. He also said that he wanted to talk to her about "some tax situation." Paul was not familiar with the tax issue, but on cross-examination he said that within the year preceding decedent's death, decedent had expressed concern that defendant would turn him in to the IRS.

Decedent's ex-wife and friend, Theresa Higgins Gilhuley ("Theresa"), testified that decedent had told her his relationship with defendant had become too stressful, and he wanted to end it. In mid-February 2014, he said that defendant was threatening to report him to the IRS for unpaid taxes. Theresa asked him why he would want to be with someone who was blackmailing him.

At some point after the shooting, Koellhoffer contacted Theresa and asked her to retrieve some of decedent's belongings from defendant's house. Theresa

went to defendant's house and found an IRS whistleblower form on top of a box that contained memorabilia decedent had collected.

Colleen Roper testified that she and decedent began dating in the fall of 2013, and, at the time of his death, she considered him her boyfriend. Roper did not know that he was also in a relationship with defendant until she learned of defendant in February 2014 after receiving prank calls in January 2014. One of the prank calls sounded like a young boy who said that decedent had a girlfriend who he had taken to Las Vegas. Not long after that, Roper received a "friend request" on Facebook from a schoolteacher from Mount Olive.

On February 4, 2014, Roper sent a private Facebook message to the person asking who it was and how he or she knew her. She received the following in response: "Do you think sleeping with my boyfriend of six years isn't doing anything to me? . . . If the tables were turned, how would you feel?" Roper figured out that the person was defendant, and she responded that she believed decedent had broken up with her. Defendant's response was that they had just "slept together this morning." Roper told her to stop harassing and communicating with her.

A search of defendant's computer revealed that on February 4, 2014, someone used the computer to search "Colleen Roper," "New York Colleen

Roper," "New York carpenter Colleen Roper" and Roper's telephone number. Also, on February 4, 2014, decedent's home address was searched. On February 4, 12, 13, 16, 26 and 27, 2014, someone visited a website on reporting suspected tax fraud. On February 26, 2014, someone searched "tax whistleblower."

Defendant's Trial Testimony

Defendant testified in her own defense. She admitted to prank calling Roper and to sending her messages on Facebook. She said she reached out to Roper because she wanted to let Roper know that decedent was still involved with her. Defendant claimed that she and another one of decedent's girlfriends, Susan Jermyn, had many friendly conversations about his cheating, and she had hoped that she and Roper could have the same sort of discussions.

Although defendant claimed that she and Jermyn had developed a friendly relationship, defendant admitted that when she first learned that decedent was dating Jermyn in January 2013, she sent Jermyn a text message that said: "[T]his is Patrick's girlfriend. Leave him alone or I would hunt you down." Defendant testified that decedent was lying in bed with her when she wrote the text, and he told her to send it. She said he laughed about it, as it was only a joke.

Defendant testified that she had learned about decedent's debt to the IRS in 2012 and that she had encouraged him to turn himself in. She had grown tired

of his threats to contact her mother and school, so she completed an anonymous IRS whistleblower form, but she did not submit it. She claimed that the form was on her desk in her home office on March 3, 2014. On the question that asked whether the taxpayer was dangerous, defendant answered "yes."

Defendant claimed that at various times throughout their relationship decedent had abused her, primarily by pushing and degrading her, particularly when he drank too much alcohol, which she said was often. She claimed she shot him on March 3, 2014 because he had placed her in fear for her life.

In support of her claim that decedent had abused her in the past, defendant described one incident early in their relationship on December 28, 2008, when she attempted to buy a hat from a street vendor after a Giants football game. Decedent had drunk an excessive amount of beers at the game and smacked the money out of her hand while scolding her about buying from a street vendor. She ran away to her car because she felt "humiliated" and "embarrassed." When decedent got to the car, he was angry because she had left him alone with the vendor.

In August 2009, the couple vacationed in Las Vegas and decedent became jealous when he saw her at the pool talking to two men. He told her to gather her belongings and go to the room with him. In the room, he pushed her onto

A-1687-17T2

the bed, told her that the men only wanted sex from her, and then he ripped off her bathing suit.

Defendant testified that decedent became jealous and abusive on another occasion when she hired a man to put new floors in her house. Decedent told her that the man wanted sex from her, then he pushed her against the wall, and she fell down the steps. Decedent told her that if she called the police, they would not believe that he had assaulted her.

On another occasion, decedent got jealous when a friend of hers drove his new sportscar to her house to show it to her. Decedent came home intoxicated, asked her if she had had sex with the man, then broke her bedroom door and the lock on it.

Defendant also recalled that in 2011 decedent threw a cellular phone at her twice because she had met a male high school friend for drinks one evening. The first time the phone hit her face and then the sheetrock, leaving a hole in the wall. The second time, defendant blocked her face with her arms and the phone hit the wall. She said that she did not call the police because she did not believe they would help her.

Defendant further testified that on New Year's Eve 2011 or 2012, decedent came home from work between 1:30 and 2:00 a.m. intoxicated and angry that

A-1687-17T2

she had fallen asleep.  He ripped the sheet off the bed and pushed her onto the floor.

Sometime in 2012, the couple had an argument about his parents, and he choked her, pushed her against the wall and onto the floor and tried to suffocate her with a pillow.  At various times in 2012, he got angry while drinking at the Corner Pub and he took her car keys so that she had to walk home, which was a mile away.  On one occasion he pushed her against the car because she had talked to another man.

Defendant's Version of the March 3, 2014 Events

According to defendant, on March 3, 2014, decedent went to her house to retrieve some of his belongings and to return some things of hers.  He had planned to go to her house on March 1 and 2 but had canceled both days.  At about 6:00 p.m. on March 3, she sent him a text message saying that she assumed he was not coming again because she had not heard from him.  She showered, then they had a brief phone conversation where he told her that he would be there in about thirty minutes.

Defendant put on a pair of pajama pants and a sports bra and began to dry her hair in the upstairs master bathroom.  At about 6:30 p.m., she went downstairs to get a beer.  Unbeknownst to her, decedent had arrived and was in

her kitchen. He was making himself a drink while talking on the phone. She gave him a kiss, got a beer for herself, and went back upstairs to finish drying her hair.

According to defendant, when she came back down, they went into the living room and she performed oral sex on him, hoping to give him an erection. He became frustrated because he could not maintain an erection and "kind of pushed" her away and complained that it was cold in the house. She put on her coat, grabbed her pocketbook and told him that she was going to the nearby 7-11 for firewood.

When defendant returned home, decedent's car was gone, and she had a number of missed calls on her cellular phone from him. She began to text him: "Get back here right now I only went to get F-I" when a call came in from him. He sounded angry. She told him that she had gone out for firewood but apparently, he had not heard her. Decedent returned and parked in front of her house. He sat in his car for about ten minutes while she started a fire inside. When he came inside, he slammed the storm door breaking the glass and yelled at her for leaving him alone. He slurred his words, and she believed he was "really drunk."

After he calmed down, the two of them sat by the fire. She told him about

A-1687-17T2

her health issues and the problems with her son, but he did not appear interested and began kissing her neck "a little bit." He got frustrated with her crying and told her his daughter Jennifer thought she was "psycho." This frustrated defendant and she said something sarcastic about Jennifer's lack of compassion. The comment angered decedent, and defendant walked away from him while saying "and you can't even pay your taxes," which angered him more. According to defendant, decedent then "grabbed" her, "slammed" her against the door, and began "choking" her with his right hand as he said: "I'm going to fucking kill you, you fucking cunt."

As she described it, defendant managed to get away by "dropp[ing] down" onto the floor. But then decedent picked her up by her forearms and "threw [her] down towards the dining room." Referring to his tax issue, he said "I know you turned me in," then picked her up and "threw" her towards the living room. She landed on her back. She said it felt "like electricity was shooting down [her] legs." He picked her up again and "threw" her onto the stairs, where she again landed on her back. She said: "His eyes looked, uhmm, maliciously vicious and, like, pure evil. . . . I never saw his eyes look like that before." She "was scared to death" and thought that he was going to kill her.

According to defendant, she then grabbed onto a spindle on the stairs and

flipped herself over. Decedent grabbed her right foot, and she fell onto her chest. Kicking him, she freed herself and ran up the stairs into the master bedroom, which was to the left of the stairs. She waited a few seconds and heard him coming up the steps. Believing that he was going to kill her, she reached under her mattress for a revolver that she said he had left there when he lived with her from 2010 to 2012. Without looking down the steps, defendant held the gun and reached around the railing to shoot down the steps. She fired a few shots then "quickly looked" around the banister and saw a silhouette, so she continued to blindly pull the trigger. Defendant testified that there were no lights on in the stairway or upstairs when she shot.

After she fired all six shots, defendant sat at the top of the stairs "crying hysterically" for about five minutes while decedent laid at the bottom of the steps on his right side. She "creeped down the stairs on [her] rear end because [she] was afraid that he was trying to trick [her]." She reached around him to turn on a light and pleaded "Patrick, please wake up." He rolled onto his back, and she tried to feel for a pulse.

Defendant knew she had to call 9-1-1, but she allegedly could not find her cell phone. She looked throughout the house to no avail. Then she looked for her portable house phone and "finally found" it in the master bedroom. She

tried to call 9-1-1 but the battery was dying. She called her cell phone about three times and when she still could not find it, she began crying hysterically again. Phone records showed that from 10:07 to 10:09 p.m., defendant used her house phone to call her cell phone two times. She did not recall how many times she walked up and down the stairs looking for her phone, but she testified that each time she passed decedent, his appearance was the same.

At 10:09 p.m., approximately twenty-five minutes after Jennifer had called 9-1-1, defendant dialed "0911" with her house phone. She testified that she could not see the numbers because her eyes were filled with tears. About twenty seconds later she dialed "811." Less than a minute later she called 9-1-1. By this time police were outside her house, but defendant did not know that.

Defendant's Version of Her Interrogation with the Police

Defendant admitted that when police entered her house, she lied to them and said that someone had broken in while she was asleep. She denied thinking of this lie in advance, claiming that she said it "instantaneously."

Defendant recalled being transported to the police station but said her memory after that was "very blurry." She claimed that she had told police and the nurse at the police station that her body was very sore because decedent had assaulted her. There were no records of these alleged complaints, however.

A-1687-17T2

Defendant claimed that when she placed her arms under the table in the interview room, she was rubbing the top of her legs because they hurt. She denied scratching her arms to create injuries and claimed that she asked police to photograph her arms because they were the part of her body that hurt the most at the time. Defendant said that she had dipped a paper towel into a cup of water to wipe away blood that she had found on her lower back because "it was grossing [her] out."

Defendant admitted that she did not report any injury or pain to hospital personnel. She testified that she did that because police were guarding her, and she did not want to speak in their presences.

Defendant denied taking a shower, putting pajama bottoms in the washing machine and changing into clean pajama pants after the shooting. She said she had put a pair of pajama pants in the washing machine on delicate cycle before decedent came to her house and she did not take them out of the machine. She also said that after she freed herself from decedent, she did not hide in her bedroom with the door closed because decedent had broken her door and the lock, so she did not believe that she could safely hide from him.

Defendant also denied that she had taken the revolver from decedent's apartment in February 2014. She admitted to driving to his apartment on

February 19, 2014, while he was working, but claimed that she went there to retrieve a pair of glasses that she had left in early February when she had spent the long weekend with him.

Defendant admitted that she tried to entice decedent with sex, but she claimed that sex was not all that she wanted from him. She claimed that when they were broken up in the past, they still had sex with each other. She denied threatening decedent when she wrote that his luck was about to change for the way he had treated her, explaining that he had called her his lucky charm, and her text was in refence to that.

Defendant's Forensic Pathology Expert Dr. Wecht

Defendant's expert in forensic pathology, Dr. Cyril Wecht, testified that the photographs of defendant's injuries were "consistent with a struggle." He added that "based upon the facts" he received from defense counsel, "[i]t was a significant struggle." Dr. Wecht agreed with most of Dr. Suarez's conclusions regarding decedent's injuries but opined that the injury to decedent's right thumb was a grazing wound from a bullet. He disagreed that one could not sequence the bullets and decedent's positioning when they struck him.

Dr. Wecht opined that after defendant ran up the stairs and retrieved the gun from under her mattress, she fired the first shot in decedent's direction as he

A-1687-17T2

was following her up the stairs. This first bullet went into the sloped ceiling and stopped in the master bathroom. Decedent then reached up for defendant with his right hand, and the second bullet grazed his thumb. He then turned to descend the stairs, and defendant fired the third bullet, which grazed decedent's neck (Suarez's Bullet D). Defendant fired the fourth bullet, striking decedent's arm and shattering his elbow, as he continued to turn away from her (Suarez's Bullet A). The fifth bullet (Suarez's Bullet C), which caused the fatal injury, struck him in the back near his shoulder as he was descending the stairs. The sixth and final bullet (Suarez's Bullet B) struck him in the back.

Dr. Wecht testified that the gunpowder residue on the wall at the top of the stairs coincided with the first shots being blindly fired by defendant as she reached around the wall with the gun. That bullet traveled straight ahead to the sloped ceiling and stopped in the bathroom. Contrary to defendant's testimony, Dr. Wecht believed that after firing the first shot, defendant moved to the top of the stairs where she could see decedent and fired the remaining five shots. Dr. Wecht did not believe that she remained behind the wall during all six shots because the last five bullets struck decedent and only the first bullet missed him.

Dr. Wecht also estimated that when defendant fired the gun, decedent was no more than halfway up the stairs on about the seventh step. After the first

shot, decedent immediately turned to flee.

Dr. Wecht could not explain how decedent's phone ended up in the right front pocket of his jeans but said that he could have held the phone with his left hand while talking with Jennifer, and then placed the phone in his right pocket with his left hand.

Dr. Wecht conceded that his version of how the shooting occurred was not the only possible scenario. He also testified that he based his opinion on facts provided by defense counsel, as well as defendant's theory of the case, the autopsy report, and photos of defendant's and decedent's injuries.

## B.

Defendant was indicted on charges of murder, N.J.S.A. 2C:11-3(a)(1) and (2), and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a).

The State filed a pretrial motion seeking to admit defendant's statements while in police custody, as well as a number of items of evidence under N.J.R.E. 404(b) and 803(c)(3). The only pretrial decision challenged on appeal is the trial court's ruling under Rule 803(c)(3) to admit decedent's statement to his friend Luongo on the afternoon of the shooting that "she [i.e., defendant] is going to kill me someday." The court found that statement admissible under Rule 803(c)(3) as relevant to decedent's mental state and his fear of defendant

37

or concern for her behavior.

After a month-long trial in March 2016, a jury found defendant guilty of both counts. She moved for a new trial on various grounds, including challenges to part of the self-defense charge, the Rule 404(b) charge and the Rule 803(c)(3). The court denied the motion in all respects.

At sentencing, the court merged the weapons offense with the murder conviction. It sentenced defendant to thirty years' imprisonment with a thirty-year parole bar.

On appeal, the following issues (in slightly reorganized and reworded fashion) are raised for our consideration:

> I. DID THE COURT ERR IN CHARGING THE JURY ON SELF-DEFENSE (Defendant's Point I and Point II, in part)?
>
> > A. DID THE CHARGE ON SELF-DEFENSE DENY DEFENDANT A FAIR TRIAL BECAUSE IT DID NOT INCLUDE INSTRUCTION ON THE CASTLE DOCTRINE (Defendant's Point I)?
> >
> > B. DID THE CHARGE ON SELF-DEFENSE CONTAIN INSUFFICIENT FACTS ON THE PRIOR DOMESTIC ABUSE AND THE ASSAULT JUST BEFORE THE SHOOTING (Defendant's Point II, in part)?

II. DID THE COURT RECITE FACTS IN THE 404(b) BAD ACTS JURY CHARGE THAT IMPROPERLY FAVORED THE STATE (Defendant's Point II, in part)?

 A. DID THE CHARGE ON DEFENDANT'S BAD ACTS EVIDENCE IMPROPERLY FAVOR THE STATE?

 B. DID THE CHARGE ON THE CONSCIOUSNESS OF GUILT EVIDENCE IMPROPERLY FAVOR THE STATE?

 C. DID THE CHARGE ON THE PROPER USE OF PATRICK'S PRIOR BAD ACTS IMPROPERLY FAVOR THE STATE?

III. DID THE COURT ERR BY ADMITTING UNDER EVIDENCE RULE 803(c)(3) A STATEMENT PATRICK MADE TO A FRIEND AND BY FAILING TO PROPERLY CHARGE THE JURY ON THE PROPER USE OF THE STATEMENT (Defendant's Point III)?

IV. DID THE PROSECUTOR MAKE STATEMENTS IN SUMMATION THAT DENIED DEFENDANT A FAIR TRIAL (Defendant's Point IV)?

V. IS DEFENDANT ENTITLED TO A NEW TRIAL ON THE BASIS OF CUMULATIVE ERROR (Defendant's Point V)?

## II.

We first address defendant's primary argument that she is entitled to a new

trial because the trial court committed plain error by instructing the jury that she had a duty to retreat from her own house when decedent allegedly came after her, and that her claim of self-defense was not legally tenable if she could have retreated to safety. As we have already noted, defendant's case hinged upon her contention that she shot defendant in self-defense.[3]

During the charge conference, counsel and the court discussed numerous aspects of the charge. Among other things, the prosecutor advised the court that aggravated manslaughter and reckless manslaughter had to be charged as lesser-included offenses to murder. Defense counsel objected to charging those lesser-included offenses, but the court overruled that objection and found the evidence could reasonably support such alternative lesser crimes. The court and counsel did agree that defendant's argument of self-defense would potentially apply to both the murder charge and the alternative manslaughter charges.[4]

The court also acknowledged that, in summations, defendant was free to argue "imperfect self-defense", i.e., that she had an honest but unreasonable

---

[3] In fact, the first twelve words of defense counsel's opening to the jury were: "Kill or be killed. Kill or be killed. Kill or be killed."

[4] For reasons that are not entirely clear, the parties and the court agreed that no jury charge on passion/provocation manslaughter was appropriate. On retrial, the court and the parties are free to reconsider this omission.

A-1687-17T2

belief to use deadly force to defend herself. As the court further recognized, such a belief could affect whether she acted with "extreme indifference" to decedent's life (i.e., indicative of murder) or "just regular recklessness" (i.e., manslaughter).[5] In any event, defendant's claim of self-defense was undoubtedly at the heart of the parties' competing theories.

A.

During the jury charge, the court gave a lengthy instruction on self-defense. It began as follows:

> The defendant contends that if the State proves she used deathly force upon the victim, Patrick Gilhuley, that such force [was] justifiably used for her self-protection. The relevant statute reads generally as follows: Quote, "the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself"—in this case herself—"against the use of unlawful force by such person—by such other person on the present occasion," end quote.
>
> In other words, self-defense is the right of a person to defend against any unlawful force.
>
> Self-defense is also the right of a person to defend against seriously threatened unlawful force that is actually pending or reasonably anticipated. <u>When a person is in imminent danger of bodily harm, the person</u>

---

[5] The judge's comment is consistent with footnote 1 of the self-defense charge. <u>See</u> <u>Model Jury Charge (Criminal)</u>, "Justification - Self-Defense in Self Protection (N.J.S.A. 2C:3-4)" (rev. June 13, 2011).

41

has the right to use force or even deadly force when that force is necessary to prevent the use against her of unlawful force.

The force used by the defendant must not be significantly greater than and must be proportionate to the unlawful force threatened or used against the defendant.

Unlawful force is defined as force used against a person without the person's consent in such a way that the action would be a civil wrong or a criminal offense. If the force used by the defendant was not immediately necessary for the defendant's protection or if the force used by the defendant was disproportionate in its intensity, then the use of such force by the defendant was not justified and the self-defense claim fails.

[(Emphasis added).]

After explaining that there were different types of force that a person could use in self-defense and that this case involved deadly force, the court continued:

The use of deadly force may be justified only to defend against force or the threat of force of nearly equal severity and is not justifiable unless the defendant reasonably believes that such force is necessary to protect herself against death or serious bodily harm.

[(Emphasis added).]

After defining deadly force, serious bodily harm, and reasonable belief, the court then explained:

Even if you find that the use of deadly force was reasonable, there are limitations on the use of deadly force.

If you find that the defendant, with the purpose of causing death or serious bodily harm to another person, provoked or incited the use of force against her in the same encounter, then the defense is not available to her.

The court then instructed the jury that defendant had an obligation to retreat, if it could be done with complete safety:

If you find that the defendant knew that she could avoid the necessity of using deadly force by retreating, provided that the defendant knew that she could do so with complete safety, then the defense is not available to her.

In your inquiry as to whether a defendant who resorted to deadly force knew that an opportunity to retreat with complete safety was available, the total circumstances, including the attended excitement accompanying the situation, must be considered.

[(Emphasis added).]

The court then explained that the State had the burden of disproving the elements of self-defense:

The State has a burden to prove to you beyond a reasonable doubt that the defense of self-defense is untrue. This defense only applies if all of the conditions or elements previously described exist. The defense must be rejected if the State disproves any of the conditions beyond a reasonable doubt.

> The same theory applies to the issue of retreat. Remember that the obligation of the defendant to retreat only arises if you find that the defendant resorts to the use of deadly force. If the defendant does not resort to the use of deadly force, one who is unlawfully attacked may hold her position and not retreat whether the attack upon her is by deadly force or some lesser force.
>
> The burden of proof is upon the State to prove beyond a reasonable doubt that the defendant knew she could have retreated with complete safety. If the State carries its burden, then you must disallow the defense. If the State does not satisfy this burden and you do have a reasonable doubt, then it must be resolved in favor of the defendant and you must allow the claim of self-defense and acquit the defendant.
>
> A valid claim of self-defense entitles defendant to exoneration on criminal liability on all charges related to her alleged aggressor including aggravated or [reckless] manslaughter [sic] since a person who kills in the honest and reasonable belief that the protection of her own life requires the use of deadly force does not kill recklessly.
>
> [(Emphasis added).]

Defendant contends that the court's failure to instruct that she had no duty to retreat in her home constituted plain error. She stresses that during the course of the trial, the State repeatedly insinuated to the jury that she could have retreated safely and avoided the use of deadly force. Because decedent threatened to kill her in her own home, defendant contends that she had no duty

to retreat, and the court's failure to so instruct the jurors was plain error.

## B.

The State does not dispute that the trial court erred in instructing the jury that defendant had a duty to retreat to safety in or from her own dwelling, and that her justification of self-defense would be nullified if she failed to discharge that obligation. The applicable law and the model jury charge make clear that a person has no such duty to retreat within or from the person's own dwelling.

Before 1999 in New Jersey, our courts held that a resident of a dwelling had an obligation to retreat when attacked in the dwelling by a cohabitant. See State v. Gartland, 149 N.J. 456, 467 (1997). The Legislature abolished that duty in 1999 when it eliminated language in Title 2C mandating such a duty to retreat in one's own home, so long as the decedent was not the initial aggressor. See L. 1999, c. 73 § 1.

The change in the law was largely prompted out of concern for victims of domestic violence who attempt to defend themselves from attacks within their own homes. See Gartland, 149 N.J. at 468–69 (quoting Maryanne E. Kampmann, The Legal Victimization of Battered Women, 15 Women's Rights L. Rep. 101, 112-13 (1993)) ("[The] loophole in the castle doctrine profoundly impacts battered women. If the attacker has as much right to be in the home where the

attack occurs, the duty to retreat still applies."). The New Jersey amendment parallels a similar provision within the Model Penal Code that applies the "castle" exception to the duty to retreat. See Model Penal Code § 3.04 (Am. Law. Inst. 2019).

Under current law, N.J.S.A. 2C:3-4 provides the following guidance on self-defense:

> a. Use of force justifiable for protection of the person. Subject to the provisions of this section and of section 2C:3-9, the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> b. Limitations on justifying necessity for use of force.
>
> . . . .
>
> (2) The use of deadly force is not justifiable under this section unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm; nor is it justifiable if:
>
> (a) The actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter; or
>
> (b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating . . . , except that:

46

(i) The actor is not obliged to retreat from his dwelling, unless he was the initial aggressor . . . .

[(emphasis added).]

Case law, including opinions since the 1999 amendment, has consistently applied these principles of self-defense. In order to succeed on a self-defense claim where the defendant used deadly force, the jury must find that: (1) the defendant had an honest and reasonable belief that deadly force was necessary to protect herself from serious bodily injury or death, and (2) the defendant did not provoke the attacker. N.J.S.A. 2C:3-4(a) and (b)(2)(a). State v. Kelly, 97 N.J. 178, 197 (1984). Whether the defendant's belief was reasonable is measured by what the jury, not the defendant, considers reasonable under an objective standard. State v. Bess, 53 N.J. 10, 15-17 (1968). Accord State v. Handy, 215 N.J. 334, 356-57 (2013).

If the alleged assault occurred outside the defendant's dwelling, the jury must also find that the defendant was unable to retreat with complete safety. N.J.S.A. 2C:3-4(b)(2)(b); State v. Rodriguez, 195 N.J. 165, 175 (2008); Gartland, 149 N.J. at 467. But, importantly, if the alleged assault occurred in the defendant's dwelling, the duty to retreat does not exist, so long as the defendant did not provoke the attacker. State v. Montalvo, 229 N.J. 300, 320

A-1687-17T2

(2017).

Hence, in <u>Montalvo</u>, the Court ruled that a trial court committed reversible error in instructing a jury in a murder case that self-defense does not justify the possession of a machete in one's own home unless the defendant armed himself spontaneously to repel an immediate threat. <u>Id.</u> at 321-24. Among other things, the Court noted "[t]he home is afforded special treatment within the justification of self-defense." <u>Id.</u> at 319.

As the Court further noted in <u>Montalvo</u>, "jury instructions demand careful attention." <u>Id.</u> at 320. "They 'must provide comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" <u>Ibid.</u> (quoting <u>State v. Singleton</u>, 211 N.J. 157, 181-82 (2012) (internal citations omitted)). In essence, the court's instructions on the law are a "roadmap" for the jurors. <u>State v. Fowler</u>, 239 N.J. 171, 192 (2019); <u>State v. Savage</u>, 172 N.J. 374, 387 (2002). "[W]ithout an appropriate charge a jury can take a wrong turn in its deliberations." <u>State v. Martin</u>, 119 N.J. 2, 15 (1990).

The pertinent model jury charges make clear that the "castle" doctrine must guide jurors in their deliberations over a defendant's assertion of self-defense when the defendant had been attacked in his or her own dwelling.

<u>Model Jury Charge (Criminal)</u>, "Justification - Self-Defense in Self Protection (N.J.S.A. 2C:3-4)" (rev. June 13, 2011). The model charge includes an important proviso in footnote 4 that cautions that: "An exception to the rule of retreat, however, is that a person <u>need not retreat from his or her own dwelling</u>, including the porch, unless he or she was the initial aggressor. N.J.S.A. 2C:3-4b(2)(b)(i)." (Emphasis added).

We cannot tell from the briefs and the record why the trial court omitted this important principle and instead charged the jury that defendant had an affirmative duty to retreat to safety from her own dwelling. There is no discussion of this portion of the charge in the transcript of the lengthy charge conference. We recognize that defense counsel did not raise an objection to this critical portion of the charge. Accordingly, we must assess on appeal whether this flaw in the charge was "plain error" or instead was merely harmless. <u>State v. Daniels</u>, 182 N.J. 80, 95 (2004). We conclude the error was indeed plain error, and that it was sufficiently harmful to defendant to undermine the integrity of the jury's guilty verdict on the murder count.

"Plain error refers to any error 'clearly capable of producing an unjust result.' <u>R.</u> 2:10-2." <u>Montalvo</u>, 229 N.J. at 320-21. When a defendant asserts plain error arising from a flawed jury instruction that was not objected to below,

he or she must establish: (1) "legal impropriety in the charge prejudicially affecting [his or her] substantial rights" and (2) an error "sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).

The first part of this two-part test—legal impropriety in the charge—is conceded by the State. The jury should have been advised that, unless the State proved she was the initial aggressor, defendant had no duty to retreat in her own home. The second part of the test concerns whether the error was harmful or harmless. In that vein, we must heed the well-settled maxim that errors in a jury charge in a criminal case are generally, if not invariably, regarded as "poor candidates" for the application of the harmless error doctrine and are "ordinarily presumed to be reversible error." State v. Afanador, 151 N.J. 41, 54 (1997); see also State v. McKinney, 223 N.J. 475, 496 (2019) (reaffirming this long-standing principle).

C.

During the course of the trial, the subject of whether defendant could have safely retreated before she fired the gun at her perceived attacker arose several

times, particularly through efforts by the prosecutor.

In her direct examination recounting decedent's past violent conduct and threats against her, defendant described an incident in 2011 in which she fled upstairs to her bedroom after decedent jealously accused her of inappropriately having a male friend visit to show her his new car. After the friend left her house, defendant went upstairs to her bedroom and locked the door to the bedroom "because she was afraid of what [decedent] was going to do[.]" She recounted that decedent, who was "very drunk," broke through the locked door and forced his way into the bedroom. Decedent cursed at her and threw her on the floor. She did not call the police.

On cross-examination of defendant, the prosecution probed into whether she had repaired the lock on the bedroom door. Defendant testified she had not fixed the lock because she was focused on other things. The prosecutor pressed further, showing defendant three photographs, Exhibits S-620, S-621 and S-622, showing the door lock in a condition missing the lock plate and screws.

Later in the cross-examination, the prosecutor moved into evidence Exhibit S-622, depicting the damaged lock, and asked the court to publish it to the jury. Then the prosecutor confronted defendant with a different photo, Exhibit S-54, which apparently showed the lock plate in an intact position,

51

suggesting that either defendant had lied about the damage or had altered the lock. Defendant explained on redirect that she had put the plate back into position without securing it with screws as a stopgap measure so she could close the bedroom door when her children were home. Through colloquy with the court and further questioning, it was revealed that the photo in S-54 was apparently taken in March 2014, shortly after the shooting, whereas S-620, S-621, and S-622 were among three photos apparently taken on behalf of defendant in April 2015.[6]

In summation, defense counsel argued that defendant could not have retreated safely into her bedroom on the night of the shooting, because the door lock was broken and thus the bedroom was "no safe haven." The prosecutor countered that point in summation by showing the jurors again the photos of the door lock, intimating that defendant's claim the door was broken was false.

Regardless of the actual condition of the bedroom door lock, the parties' extended back-and-forth on this point clearly shows that the question of whether defendant could have retreated into the bedroom with safety was a significant issue presented for the jury's consideration. That retreat issue was litigated

---

[6] The parties have not supplied this court with the photo exhibits in their submissions. Nonetheless, the content of the photos is reasonably inferable from the briefs and trial transcripts.

without a proper instruction concerning a non-aggressor's lack of a legal obligation to retreat within his or her own home.

Additionally, the prosecution further injected the retreat issue into the case by posing the following line of multiple questions to defendant on cross-examination:

> Q. And you were concerned that he would trick you, but it is your testimony that <u>at no point did you run into your bedroom?</u>
>
> A. No.
>
> Q. No point <u>did you try to barricade yourself into your bedroom</u>?
>
> A. No.
>
> Q. At <u>no point did you go to a window and scream out the window and beg for help?</u>
>
> A. I, I didn't think about it. My -- it was, like I said, it was devastating. I didn't know what to do next.
>
> Q. <u>At no point during that 4 or 5 minutes did you grab a phone and call 911?</u>
>
> A. No.
>
> [(Emphasis added).]

Taking into account these queries and the other evidence, the record shows the State insinuated to the jury that defendant could have and should have

retreated on the night of the shooting, by locking or "barricading" herself into the bedroom, or by calling for help, or doing both. Given these repeated insinuations, the absence of an appropriate jury charge on the "castle" doctrine was therefore harmful.

To be sure, we appreciate the parties' hotly disputed contentions as to whether defendant or decedent was the initial aggressor that night. And we are also mindful the prosecution did not expressly use the word "retreat" or mention its burden of proof concerning safe retreat during its closing argument. Even so, the retreat issue was sufficiently implicated and insinuated to raise reasonable doubts about whether the jury was misled by the flawed instruction. The charge not only omitted the "castle" exception, but expressly told the jurors—in no uncertain terms—that self-defense was not available to defendant if she could have safely retreated or was the initial aggressor. That mistake easily could have permeated the jury's consideration of self-defense, not only with respect to the murder count but also the lesser-included homicide offenses.

That said, we reject defendant's contention that, apart from the critical duty-to-retreat flaw in the charge, she is entitled to a new trial because the court should have specified in the charge the alleged previous instances of domestic violence by decedent. Those alleged prior acts were sufficiently detailed in the

defense's case and in defense counsel's vociferous summation. However, the charge as a whole adequately conveyed the pertinent concepts. See, e.g., Gartland, 149 N.J. at 473 (although the trial court did not tell the jury it could consider prior spousal abuse in assessing defendant's belief about the need to use deadly force, the charge as a whole adequately conveyed the notion).

We appreciate that the State presented strong evidence of defendant's guilt of a purposeful intent to kill decedent, particularly the proof that she fired multiple gunshots into his back (apart from the shot that apparently grazed his hand) and decedent's three panicked calls to his daughter. We also appreciate that it is possible the jury did find on the facts that defendant had no safe way to retreat before firing the gun, but nonetheless concluded that she was the initial aggressor or that she acted unreasonably in using lethal force, or both.

Nonetheless, the court's flawed self-defense charge could have materially affected the jury's assessment of her conduct. Among other things, the flawed guidance to the jurors on self-defense principles could have affected whether she was guilty of a lesser included homicide offense, such as reckless manslaughter, rather than murder. The erroneous charge could easily have nullified the self-defense claim that was the heart of defendant's case. It

unfortunately invited the jurors to "take a wrong turn" in their deliberations. Martin, 119 N.J. at 15.

Because there was plain error "clearly capable of producing an unjust result," R. 2:10-2, we are constrained to vacate defendant's murder conviction on this basis and order a new trial.

## III.

Having ordered a new trial because of the flawed jury charge on self-defense, we are not required to reach the remaining issues raised on appeal. We discuss them succinctly, for sake of completeness.

## A.

Defendant argues she is independently entitled to a new trial because the court gave the jurors "unbalanced" instructions on the use of N.J.R.E. 404(b) "prior bad acts" evidence. We are unpersuaded that a new trial is required on this basis.

The Rule 404(b) instructions appropriately informed the jurors they could consider defendant's various acts preceding the night of the shooting (such as her harassing calls to other women with whom decedent was dating) probative of her state of mind. See Rule 404(b) (stating that prior bad acts may be admissible to show, among other things, motive or intent). The court also

appropriately told the jurors they could consider defendant's post-shooting conduct (such as her apparent attempts to clean blood off her pajamas, her delay in calling 9-1-1, and her possibly self-inflicted scratches of her arms) as possible evidence of a consciousness of guilt. State v. Williams, 190 N.J. 114, 134-35 (2007). As to both categories of Rule 404(b) proof used against defendant, the court fairly cautioned the jurors, consistent with the model charge, that they must not draw inferences that she was a bad person with a disposition to commit wrongdoing, and only could use the evidence for the specified limited purposes. See State v. Cofield, 127 N.J. 328, 341 (1992); See also Model Jury Charges (Criminal), "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))" (rev. September 12, 2016).

The court appropriately issued reciprocal Rule 404(b) instructions about decedent's alleged prior bad acts, such as his assaultive conduct, excessive drinking, and failure to pay taxes. Although those instructions about decedent's own behavior could have been more detailed (and indeed should be amplified at a future new trial for sake of descriptive balance) we discern no error occurred that was clearly capable of producing the jury's guilty verdict. R. 2:10-2.

B.

The court did not misapply its discretion or stray from the governing law

in admitting Luongo's testimony about decedent's statement of fear. The statement was clearly probative of decedent's own state of mind concerning defendant. It went to the critical disputed issues of who was the aggressor and defendant's assertion of self-defense. The Supreme Court has held such expressions of fear may be admitted to establish the identity of the aggressor or perpetrator. See, e.g., State v. Scharf, 225 N.J. 547, 570 (2016); State v. Machado, 111 N.J. 480, 485 (1988). We recognize decedent did not refer to defendant by her name when he spoke with Luongo, but there was sufficient circumstantial evidence in the context to reasonably indicate that he meant her and was not necessarily joking about the subject. Defendant's theory that decedent was referring to a different woman or was merely speaking in jest was a factual dispute for the jury to resolve.

In addition, the court provided adequate limiting instructions on the use of this evidence, both at the end of Luongo's testimony and in the final charge. We reject defendant's argument that the court was obligated to advise the jurors that Luongo's testimony had to be false because of phone records reflecting that defendant did not send decedent a text on March 3 before 6:00 p.m. The weight and veracity of Luongo's testimony was for the jury to evaluate. The jury

logically could have found his testimony credible, even if defendant had not sent decedent a text earlier in the day of the shooting.

In sum, this evidence of fear was plainly admissible and probative, and the court did not misapply its discretion under N.J.R.E. 401 and 403 in declining to exclude it. See Scharf, 225 N.J. at 572 (reiterating the well-settled principle that appellate courts generally review evidentiary rulings under a deferential abuse of discretion standard).

## C.

Defendant singles out several portions of the prosecutor's summation, which she contends were so improper and prejudicial as to mandate a new trial. Having reviewed those passages—in the full context of the vigorous closing arguments of both parties—we reject defendant's claim of reversible error.

Significantly, defendant did not object to these remarks during or after the State's closing. "Generally, if counsel did not object, the remarks will not be deemed prejudicial." State v. Josephs, 174 N.J. 44, 124 (2002). We are therefore guided by a plain error scope of review concerning the remarks. Applying that standard, we discern no reason to set aside the verdict on this basis.

More specifically, the prosecutor's comments about the integrity of the State's investigation into the shooting, and the integrity of those involved in the case were responsive to the attacks made upon law enforcement during defense counsel's own summation. See, e.g., State v. Engel, 249 N.J. Super. 336, 379 (App. Div. 1991) (explaining that a prosecutor may respond in summation to defense counsel's insinuation that the State's witnesses had lied and framed the defendant). Although the prosecutor's specific inference to not risking his own pension was better left unsaid, that misplaced comment made in the heat of adversarial combat did not deprive defendant of a fair trial.

The prosecutor also did not deprive defendant of a fair trial by criticizing Dr. Wecht's expert testimony and his credibility as a witness. While those comments were surely pointed, they were not unfair or unduly prejudicial but rather a permissible attempt to argue the witness was biased. See State v. Scott, 229 N.J. 469, 481 (2017) (recognizing a trial attorney's general right to impeach an opposing witness as biased).

Lastly, we agree with defendant that the prosecutor inaccurately stated the law in arguing that defendant's assertion of self-defense "does not apply" if the jury found that decedent was moving down the steps when she fired the gun. The prosecutor's assertion is an overstatement, because the law of self-defense

does allow the reasonable use of lethal force to repel an attacker for a continued period of time so long as the threat of immediate harm is reasonably perceived to persist. See, e.g., State v. Rambo, 401 N.J. Super. 506, 513-14, 521-22 (2008) (noting that the court appropriately charged self-defense in a case where the defendant had shot the decedent in the back after she had turned away from him and reached the bottom of a staircase, because the defendant asserted he was fearful the decedent might have killed him).

Although decedent's apparent ultimate positioning towards the bottom of the stairs was strong evidence used by the State to rebut defendant's self-defense claim, it was incorrect for the prosecutor to suggest that the law of self-defense immediately ceases to apply to a person the instant that his or her perceived attacker turns in the other direction. See, e.g., id. at 512, 521. For example, it is conceivable that an attacker might be trying to retrieve a gun or other weapon, ibid., or might not be sufficiently wounded by an initial shot to be rendered incapable of inflicting grievous bodily harm.

In any event, the trial court appropriately instructed the jurors on this particular aspect of the self-defense charge, despite its flaw about the "castle" doctrine, and also appropriately advised that the arguments of counsel about the law were not binding. There was no plain error.

## D.

Finally, we reject defendant's argument of cumulative error. The sole basis for our reversal in this case is the critical error in the self-defense charge telling the jurors defendant had an obligation to retreat in her own dwelling. Notwithstanding that one reversible error, we discern no other basis to set aside the verdict.

Other than this one unfortunate flaw in the charge that was not called to his attention, the judge displayed commendable patience and expertise in presiding over this hard-fought murder trial. We are mindful of the burdens associated with a retrial, but necessarily conclude that one is required under the circumstances, for the reasons we have detailed in Part II of this opinion.

All other points raised by defendant on the appeal, to the extent we have not addressed them, lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Reversed and remanded for a new trial, with a proper instruction on self-defense in accordance with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1687-17T2